OPINION
{¶ 1} Defendant-appellant, Matthew J. Dioneff, appeals his convictions for various counts of Engaging in a Pattern of Corrupt Activity, Burglary, Grand Theft, Theft, Breaking and Entering, and Conspiracy to Commit Burglary, and his aggregate prison sentence of twenty-seven years following a jury trial in the Ashtabula County Court of Common Pleas. For the following reasons, we affirm Dioneff's convictions and the sentence imposed by the court below. *Page 2 
 {¶ 2} On March 3, 2006, the Ashtabula Grand Jury handed down a thirty-one count indictment against Dioneff.
 {¶ 3} The first count of the indictment was for Engaging in a Pattern of Corrupt Activity, a felony of the first degree in violation of R.C.2923.32(A)(1).
 {¶ 4} Dioneff was indicted as follows for the December 2, 2005 burglary of the residence of Kim L. Miller: Burglary (count two), a felony of the second degree in violation of R.C. 2911.12, and Grand Theft (count three), a felony of the fourth degree in violation of R.C.2913.02.
 {¶ 5} Dioneff was indicted as follows for the December 8, 2005 theft of property belonging to Joel Lockwood: Breaking and Entering (count four), a felony of the fifth degree in violation of R.C. 2911.13.
 {¶ 6} Dioneff was indicted as follows for the December 10, 2005 burglary of the residence of Mary Boytz: Burglary (count five), a felony of the second degree in violation of R.C. 2911.12, and Grand Theft (count six), a felony of the fourth degree in violation of R.C. 2913.02.
 {¶ 7} Dioneff was indicted as follows for the December 12, 2005 burglary of the residence of Gary and Cindy Dunbar: Burglary (count seven), a felony of the second degree in violation of R.C. 2911.12, and Grand Theft (count eight), a felony of the fourth degree in violation of R.C. 2913.02.
 {¶ 8} Dioneff was indicted as follows for the December 12, 2005 theft of property belonging to David C. Powell: Breaking and Entering (count nine), a felony of the fifth degree in violation of R.C. 2911.13, and Grand Theft (counts ten, eleven, twelve, and thirteen), felonies of the fourth degree in violation of R.C. 2913.02. *Page 3 
 {¶ 9} Dioneff was indicted as follows for the December 22, 2005 burglary of the residence of Roger A. and Patricia Schilling: Burglary (count fourteen), a felony of the second degree in violation of R.C.2911.12, and Grand Theft (count fifteen), a felony of the fourth degree in violation of R.C. 2913.02.
 {¶ 10} Dioneff was indicted as follows for the December 23, 2005 burglary of the residence of Kevin W. Campbell: Burglary (count sixteen), a felony of the second degree in violation of R.C. 2911.12, and Grand Theft (count seventeen), a felony of the third degree in violation of R.C. 2913.02.
 {¶ 11} Dioneff was indicted as follows for the January 3, 2006 burglary of the residence of John F. and Becky Coder: Conspiracy to Commit Burglary (count eighteen), a felony of the second degree in violation of R.C. 2923.01 and 2911.12, Grand Theft (count nineteen), a felony of the third degree in violation of R.C. 2913.02, and Theft (count twenty), a felony of the fifth degree in violation of R.C.2913.02.
 {¶ 12} Dioneff was indicted as follows for the January 9, 2006 theft of property belonging to Richard A. Chamryk: Breaking and Entering (count twenty-one), a felony of the fifth degree in violation of R.C.2911.13, and Grand Theft (count twenty-two), a felony of the fourth degree in violation of R.C. 2913.02.
 {¶ 13} Dioneff was indicted as follows for the January 19, 2006 theft from Benny's coin Laundry, a business property owned by Benny R. Fobes: Safecracking (count twenty-three), a felony of the fourth degree in violation of R.C. 2911.31, Breaking and Entering (count twenty-four), a felony of the fifth degree in violation of R.C. 2911.13, and Theft (count twenty-five), a felony of the fifth degree in violation of R.C.2913.02. *Page 4 
 {¶ 14} Dioneff was indicted as follows for the January 24, 2006 burglary of the residence of Michael and Paula Scott: Burglary (count twenty-six), a felony of the second degree in violation of R.C. 2911.12, Grand Theft (count twenty-seven), a felony of the third degree in violation of R.C. 2913.02, and Theft (count twenty-eight), a felony of the fifth degree in violation of R.C. 2913.02.
 {¶ 15} Dioneff was indicted as follows for the January 25, 2006 burglary of the residence of Mark E. Sency: Burglary (count twenty-nine), a felony of the second degree in violation of R.C.2911.12, Grand Theft (count thirty), a felony of the third degree in violation of R.C. 2913.02, and Theft (count thirty-one), a felony of the fifth degree in violation of R.C.2913.02.
 {¶ 16} Dioneff pled not guilty to the charges. A jury trial commenced on May 23, 2006, and continued until June 1, 2006. In the course of the trial, the lower court, sua sponte, dismissed the Safecracking charge (count twenty-three) and reduced one of the Burglary charges (count seven) to Breaking and Entering. The jury returned guilty verdicts on all counts of the indictment as amended, although on two of the four Theft charges (counts twenty and thirty-one), the jury found Dioneff guilty of misdemeanor (first degree) Theft.
 {¶ 17} On August 22, 2006, the trial court sentenced Dioneff as follows: Dioneff received a six-year prison sentence for Engaging in a Pattern of Corrupt Activity (count one).
 {¶ 18} Dioneff received a three-year prison sentence for Burglary (counts two and five), a one-year prison sentence for Grand Theft (counts three, seven, and twenty-two), a one-year prison sentence for Breaking and Entering (counts four, twenty-one, *Page 5 
and twenty-four), and a one-year prison sentence for Theft (count twenty-five), to run concurrently with each other and with the sentences for the other convictions.
 {¶ 19} Dioneff received a one-year prison sentence for Breaking and Entering (count seven) and a one-year prison sentence for Grand Theft (count eight), to run concurrently with each other but consecutively to the sentence for Engaging in a Pattern of Corrupt Activity (count one).
 {¶ 20} Dioneff received a one-year prison sentence for Breaking and Entering (count nine) and a one-year prison sentence for Grand Theft (counts ten, eleven, twelve, and thirteen), to run concurrently with each other but consecutively to the sentences for Engaging in a Pattern of Corrupt Activity (count one) and Breaking and Entering/Grand Theft (counts seven and eight).
 {¶ 21} Dioneff received a three-year prison sentence for Burglary (count fourteen) and a one-year prison sentence for Grand Theft (count fifteen), to run concurrently with each other but consecutively to the sentences for Engaging in a Pattern of Corrupt Activity (count one), Breaking and Entering/Grand Theft (counts seven and eight), and Breaking and Entering/Grand Theft (counts ten through thirteen).
 {¶ 22} Dioneff received a four-year prison sentence for Burglary (count sixteen) and a three-year prison sentence for Grand Theft (count seventeen), to run concurrently with each other but consecutively to the sentences for Engaging in a Pattern of Corrupt Activity (count one), Breaking and Entering/Grand Theft (counts seven and eight), Breaking and Entering/Grand Theft (counts ten through thirteen), and Burglary/Grand Theft (counts fourteen and fifteen). *Page 6 
 {¶ 23} Dioneff received a four-year prison sentence for Burglary (count eighteen), a three-year prison sentence for Grand Theft (count nineteen), and a six-month prison sentence for Theft (count twenty), to run concurrently with each other but consecutively to the sentences for Engaging in a Pattern of Corrupt Activity (count one), Breaking and Entering/Grand Theft (counts seven and eight), Breaking and Entering/Grand Theft (counts ten through thirteen), Burglary/Grand Theft (counts fourteen and fifteen), and Burglary/Grand Theft (counts sixteen and seventeen).
 {¶ 24} Dioneff received a four-year prison sentence for Burglary (count twenty-six), a one-year prison sentence for Grand Theft (count twenty-seven), and a one-year prison sentence for Theft (count twenty-eight), to run concurrently with each other but consecutively to the sentences for Engaging in a Pattern of Corrupt Activity (count one), Breaking and Entering/Grand Theft (counts seven and eight), Breaking and Entering/Grand Theft (counts ten through thirteen), Burglary/Grand Theft (counts fourteen and fifteen), Burglary/Grand Theft (counts sixteen and seventeen), and Burglary/Grand Theft/Theft (counts eighteen through twenty).
 {¶ 25} Dioneff received a four-year prison sentence for Burglary (count twenty-nine), a one-year prison sentence for Grand Theft (count thirty), and a six-month prison sentence for Theft (count thirty-one), to run concurrently with each other but consecutively to the sentences for Engaging in a Pattern of Corrupt Activity (count one), Breaking and Entering/Grand Theft (counts seven and eight), Breaking and Entering/Grand Theft (counts ten through thirteen), Burglary/Grand Theft (counts fourteen and fifteen), Burglary/Grand Theft (counts sixteen and seventeen), *Page 7 
Burglary/Grand Theft/Theft (counts eighteen through twenty), and and Burglary/Grand Theft/Theft (counts twenty-six through twenty-eight).
 {¶ 26} Dioneff's aggregate prison sentence is twenty-seven years, comprised of consecutive prison terms of six, one, one, three, four, four, four, and four years.
 {¶ 27} The trial court further ordered Dioneff to pay prosecution costs, court-appointed counsel fees, any fees permitted pursuant to R.C.2929.18(A)(4), and restitution.
 {¶ 28} Dioneff timely appeals his conviction and sentence, raising the following assignments of error:
 {¶ 29} "[1.] The trial court erred by convicting Appellant despite insufficient evidence.
 {¶ 30} "[2.] The trial court erred in finding Defendant guilty despite the manifest weight of the evidence.
 {¶ 31} "[3.] The trial court denied Defendant Due Process when it found Defendant guilty despite the evidence.
 {¶ 32} "[4.] The trial court violated Appellant's Eighth Amendment rights in sentencing him to 27 years in prison."
 {¶ 33} Dioneff's first three assignments of error challenge his convictions on the grounds of sufficiency and manifest weight of the evidence and may be considered together.
 {¶ 34} The Ohio Rules of Criminal Procedure provide that a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Crim.R. 29(A). "`Sufficiency' is a term of art meaning that legal standard *Page 8 
which is applied to determine whether the case may go to the jury," i.e. "whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, quoting, Black's Law Dictionary (6 Ed.1990), 1433. Essentially, "sufficiency is a test of adequacy," that challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. Id. "The claim of insufficient evidence invokes an inquiry about due process," and thus addresses the issue raised in Dioneff's third assignment of error. State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 35} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 319. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id., at paragraph two of the syllabus.
 {¶ 36} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence."Thompkins, 78 Ohio St.3d at 387 (emphasis sic) (citation omitted). Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support the verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, at ¶ 25 (citation omitted). *Page 9 
"In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" Id.
 {¶ 37} Generally, the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine. State v. Thomas (1982), 70 Ohio St.2d 79, at syllabus. When reviewing a manifest weight challenge, however, the appellate court sits as the "thirteenth juror." Thompkins, 78 Ohio St.3d at 387 (citation omitted). The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id., quoting Martin, 20 Ohio App.3d at 175.
 {¶ 38} In order to find that Dioneff had committed the crime of Burglary, the State was required to prove, beyond a reasonable doubt, that Dioneff, "by force, stealth, or deception * * * [t]respass[ed] in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense." R.C. 2911.12(A)(2).
 {¶ 39} In order to find that Dioneff had committed the crime of Conspiracy to Commit Burglary, the State was required to prove, beyond a reasonable doubt, that Dioneff, "with purpose to commit or to promote or facilitate the commission of * * * *Page 10 
burglary * * * [w]ith another person or persons, plan[ned] or aid[ed] in planning the commission of [Burglary]." R.C. 2923.01(A)(1).
 {¶ 40} In order to find that Dioneff had committed the crime of Theft, the State was required to prove, beyond a reasonable doubt, that Dioneff, "with purpose to deprive the owner of property or services, * * * knowingly obtain[ed] or exert[ed] control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent." R.C. 2913.02(A)(1).
 {¶ 41} In order to find that Dioneff had committed the crime of Grand Theft, the State was required to prove, beyond a reasonable doubt, that Dioneff committed the crime of Theft and "the value of the property or services stolen is five hundred dollars or more and is less than five thousand dollars" (fifth degree Theft), or that Dioneff committed the crime of Theft and the property stolen is either "[a] credit card * * * [or] a printed form for a check or other negotiable instrument" (fifth degree Theft); "a firearm or dangerous ordnance" (third degree Theft); or "a motor vehicle" (fourth degree Grand Theft), or that Dioneff committed the crime of Theft and "the value of the property or services stolen is five thousand dollars or more and is less than one hundred thousand dollars" (fourth degree Grand Theft), R.C. 2913.02(B)(2), (4), and (5); R.C. 2913.71(B).
 {¶ 42} To find that Dioneff had committed the crime of Breaking and Entering, the State was required to prove, beyond a reasonable doubt, that Dioneff, "by force, stealth, or deception, * * * trespass[ed] in an unoccupied structure, with purpose to commit therein any theft offense * * * or any felony" or that Dioneff "trespass[ed] on the land or premises of another, with purpose to commit a felony." R.C. 2911.13(A) and (B). *Page 11 
 {¶ 43} "Stealth" has been ably defined as "any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without persmission." State v.Lane (1976), 50 Ohio App.2d 41, 47.
 {¶ 44} Kathleen Cunha, Dioneff's former girlfriend of five years, testified on behalf of the prosecution in exchange for immunity from prosecution. Dioneff and Cunha resided together in a home at 1902 Middle Road, Pierpont. Cunha identified several locations where Dioneff had committed burglaries/thefts, identified several of Dioneff's accomplices, and assisted in the recovery of stolen property.
 {¶ 45} Dioneff was charged with Burglary and fourth degree Grand Theft for the December 2, 2005 burglary of the Miller residence at 302 West 58th Street, Ashtabula. At trial, Kimberly Miller testified that persons had entered her home through a bedroom window and taken jewelry worth approximately $8,000 and $100 in coins belonging to her son. Miller testified that some, but not all, of her jewelry was recovered. Cunha testified that she was present with Dioneff when he was casing the Miller residence and that Dioneff believed drugs could be found in the residence. She testified the Miller residence was broken into by Dioneff, Mark Corey, and Steven Zepeda. Cunha testified that, at Dioneff's request, she sold some of Miller's jewelry to Carey Newsome, which was subsequently recovered by the police. Cunha's testimony is corroborated by the recovery of some of Miller's jewelry from Newsome. Thus, there is sufficient evidence that Dioneff trespassed in an occupied structure with purpose to deprive Miller of property worth in excess of $5,000.
 {¶ 46} Dioneff was charged with Breaking and Entering for the December 8, 2005 theft of property belonging to Joel Lockwood, a resident of 1069 Brownville Road, *Page 12 
Rome. At trial, Lockwood testified that persons had trespassed in his utility shed and camping trailer located on his property. Lockwood testified the locks had been broken and that a chain saw with attachments, camping stove, jig saw, reciprocal saw, and a winch had been taken. Cunha testified that she dropped Dioneff and Zepeda off near Lockwood's property. When Cunha returned to pick them up they were carrying bolt cutters, a chain saw, and a winch. Thus, there is sufficient evidence that Dioneff trespassed on another's property with purpose to commit a Theft offense.
 {¶ 47} Dioneff was charged with Burglary and fourth degree Grand Theft for the December 10, 2005 burglary of the Boytz residence at 2409 Pleasantview Road, Ashtabula. At trial, Mary Boytz testified that persons had entered her home through a crawl space and kicked a hole through the drywall and taken all her jewelry, valued at approximately $8,000 to $10,000, a pair of binoculars, and approximately $450 in cash. Cunha testified that she had dropped off Dioneff and Zepeda near the Boytz residence. When she returned to pick them up they were carrying a pillow case full of jewelry. Cunha testified she sold some of the jewelry to her mother. Cunha's testimony is corroborated by the recovery of some of Boytz' jewelry from Cunha's mother. Thus, there is sufficient evidence that Dioneff trespassed in an occupied structure with purpose to commit Grand Theft of property worth in excess of $5,000.
 {¶ 48} Dioneff was charged with Breaking and Entering and fourth degree Grand Theft for the December 12, 2005 theft of property belonging to David Powell, of 510 Plymouth Ridge Road, Ashtabula. At trial, Powell testified that someone had removed five motorcycles or "dirt bikes" from the barn they were stored on his property. Powell found the motorcycles leaning against trees near the barn. According to Cunha and the *Page 13 
police report, only four motorcycles had been removed from the barn. Cunha testified that she had dropped Dioneff and Zepeda off near the Powell residence. When she returned, Dioneff wanted her to drive his Chevy Tahoe onto the property so they could take some of the motorcycles. Cunha refused and, after argument with Dioneff, they left Powell's property without the motorcycles. Thus, there is sufficient evidence that Dioneff trespassed upon the Powell's property with the intent of depriving him of property and exerted control over Powell's motorcycles without his consent.
 {¶ 49} Dioneff was charged with Breaking and Entering and fourth degree Grand Theft for the December 12, 2005 theft of property belonging to Gary Dunbar, Jr., of 1767 Carson Road, Plymouth Township. At trial Dunbar testified that a Honda four-wheeler stored had been taken from a barn on his parents' property where he resided. The vehicle was recovered by State Highway Patrol Trooper, Scott Balcomb, at the nearby intersection of Carson and Brown Roads. Cunha testified she had dropped Dioneff and Zepeda off near the Dunbar residence and they had stolen a four-wheeler. Cunha testified they had tried to tow the four-wheeler behind the Tahoe but abandoned the vehicle somewhere along Carson Road after being spotted by a public utility vehicle. Thus, there is sufficient evidence that Dioneff trespassed on the Dunbars' property with purpose to commit felony Theft of a motor vehicle.
 {¶ 50} Dioneff was charged with Burglary and fourth degree Grand Theft for the December 22, 2005 burglary of the Schilling residence at 4310 East Center Street, North Kingsville. At trial, Roger Schilling testified that, while he was at work, persons had entered his home and taken Christmas presents, jewelry, and a plastic water jug full of coins. Schilling testified he and Dioneff had formerly been "pretty good friends" and *Page 14 
Dioneff had helped him move into his home about thirteen years before. Cunha testified she dropped Dioneff and Zepeda off near the Schilling residence. When she picked them up they were carrying a jug of coins which they subsequently converted into over $800 cash. The empty jug was later recovered from Dioneff's home. Thus, there is sufficient evidence that Dioneff trespassed in an occupied structure with purpose to commit Grand Theft of property worth in excess of $500.
 {¶ 51} Dioneff was charged with Burglary and third degree Grand Theft for the December 23, 2005 burglary of the Campbell residence at 1500 Plymouth Ridge Road, Plymouth Township. At trial, Kevin Campbell testified that persons entered his home by kicking in his front door and had taken a 12-gauge shotgun, 20-gauge shotgun, .22 caliber rifle, .50 caliber muzzle loader, two hunting bows, and a digital camera. Campbell testified that his insurance company had estimated the value of the stolen items at $3,000. Campbell knew Dioneff through his brothers and Dioneff had been at Campbell's home previously for a summer party. Cunha testified she and Dioneff had driven past Campbell's residence several times because Dioneff believed Campbell kept "weed" at his home. Cunha dropped off Dioneff and Zepeda near the Campbell residence and saw Dioneff kick in the front door. Cunha testified that, when she picked Dioneff and Zepeda up later, they were carrying several guns and bows. Thus, there is sufficient evidence that Dioneff trespassed in an occupied structure with purpose to deprive Campbell of a firearm or dangerous ordnance.
 {¶ 52} Dioneff was charged with Conspiracy to Commit Burglary, third degree Grand Theft, and fifth degree Theft for the January 3, 2006 burglary of the Coder residence at 6491 Knapp Road, Cherry Valley. At trial, John Coder testified that, while *Page 15 
he and his wife were at work, persons entered his home and took seven or eight guns with an estimated value between $1,200 and $1,500, his wife's jewelry with an estimated value of $2,500, and an electric blanket. Coder testified Dioneff Roofing had done some work on his house approximately one year before the break in. Cunha testified she and Dioneff had previously stolen marijuana plants from the Coder's property. Cunha went to the Coder residence in January with Dioneff, Zepeda, and her long-time friend, Michael K. Manis. Cunha testified she and Dioneff remained in the vehicle, while Zepeda and Manis made two trips into the Coder residence, returning with guns wrapped in a blanket and jewelry. Manis testified that Dioneff elicited his participation in burglarizing the Coder residence and that Dioneff targeted the Coder residence because he was familiar with the Coders through his family's roofing business. Thus, there is sufficient evidence that Dioneff planned and aided another in the trespass of an occupied structure with purpose to deprive the owners of property worth in excess of $500 and of firearms.
 {¶ 53} Dioneff was charged with Breaking and Entering and fourth degree Grand Theft for the January 9, 2006 theft of property belonging to Richard A. Chamryk, who owns a hunting cabin at 6632 Footville-Richmond Road, Andover. At trial, Chamryk testified that persons had entered upon his property and removed an all-terrain vehicle from a shed by cutting the lock with bolt cutters, a pair of binoculars, and a portable hunting blind. Cunha testified that she dropped Dioneff and Zepeda off near Chamryk's cabin and that they stole the all-terrain vehicle and drove it to Ashtabula where it was sold for $400. Thus, there is sufficient evidence that Dioneff trespassed in an unoccupied structure with purpose to deprive Chamryk of a motor vehicle. *Page 16 
 {¶ 54} In connection with Benny's Coin Laundry, Dioneff was charged with Breaking and Entering and fifth degree Theft for the January 19, 2006 theft of property from Benny's Coin Laundry, located at 239 East Main Street, Geneva.
 {¶ 55} Eleven-year-old Paul Alley of 257 East Main Street, Geneva, testified at trial that, on January 19, 2006, he saw two men wearing masks and dressed in black "sneaking" out of the back of Benny's Coin Laundry and running across the street toward the Hong Kong King Buffet. Paul told his parents what he had seen and his parents contacted the police. Paul's older brother, Randall J. Alley, went outside and saw "a green Blazer" pull into the restaurant located across the street and two men come out from behind the trash dumpsters and enter the vehicle.
 {¶ 56} Also on January 19, 2006, at about 10:30 p.m., Geneva Patrolman Mike Palinkas was dispatched to assist at a traffic stop on North Broadway in Geneva in which the driver "was acting in a suspicious manner." Palinkas connected this vehicle, a dark colored Chevy Tahoe, with the description of the vehicle involved in the suspicious activity at Benny's Coin Laundry, noting that the Blazer and Tahoe are similar models. Palinkas found Dioneff behind the wheel of the Tahoe and identified Cunha and Zepeda as passengers. After noticing the smell of burnt marijuana in the vehicle, Palinkas searched the vehicle and found an ounce of marijuana in an overhead storage compartment. Palinkas also discovered a set of two-way radios, along with an ipod, its charger, and audio cables. Learning that there was an outstanding warrant for Zepeda's arrest, Palinkas took him into custody. Palinkas issued Dioneff a citation for the marijuana and allowed him and Cunha to leave. *Page 17 
 {¶ 57} Early the next morning, David L. Robison, an employee of Benny's Coin Laundry, found that persons had broken into the laundry and ripped the money changer off the wall. In addition to the money changer, Robison's ipod, charger, and audio cables were also missing. Robison contacted the police and the laundromat's owner, Benny R. Fobes. Patrolman Palinkas was dispatched to the laundry mat and spoke with Robison. Palinkas realized that the ipod, charger, and cables he had seen earlier in Dioneff's vehicle matched the description given by Robison.
 {¶ 58} Patrolman Palinkas notified the Ashtabula County Sheriff's Department and proceeded to Dioneff's residence in Pierpont where he was met by Sheriff's Deputies. There, Palinkas spoke with Cunha and Dioneff about the break in at Benny's Laundry. With Dioneff's consent, Palinkas searched the house and Tahoe, where he found the ipod, charger, and cables. Palinkas informed Dioneff that he was placing him under arrest for Receiving Stolen Property, but Dioneff fled before he could be apprehended. Palinkas arrested Cunha at this time for Receiving Stolen Property.
 {¶ 59} Cunha would testify at trial in detail regarding Dioneff's role in breaking into the laundromat and that, following his flight, he began to stay at a hotel. On the morning of January 20, 2006, she told Patrolman Palinkas that Dioneff had said he was taking the coin changer to Terry Rylance's house.
 {¶ 60} Based on the information obtained from Cunha, Patrolman Palinkas proceeded to Rylance's residence where he located and seized the coin changer taken from Benny's laundry. Fobes testified at trial that the burglars had entered the laundry through a large vent for the dryers and that the coin changer cost approximately $2,145 when purchased and contained about $1,500 when stolen. *Page 18 
 {¶ 61} Thus, there is sufficient evidence that Dioneff trespassed in an unoccupied structure with purpose to deprive the owner of property worth in excess of $500.
 {¶ 62} Dioneff was charged with Burglary, third degree Grand Theft, and fifth degree Theft for the burglary of the Scott residence at 1809 State Route 192, Denmark Township. At trial, Paula Scott testified that, while she was at work, persons kicked open her back door and entered her home. Scott testified that her purse, checkbook, and credit cards had been stolen. Scott's husband testified that a 9mm assault rifle with a scope, a .22 caliber handgun, a .32 caliber handgun, and ammunition had been stolen from his gun cabinet. Paula testified that she knew Manis and he had previously been at her home. Manis testified that he proposed the Scott burglary to Dioneff, because he knew the Scotts owned guns and worked during the day. Manis also testified that he, Dioneff and Kilpatrick entered the Scott residence and took the guns.
 {¶ 63} Deputy James Kemmerle was dispatched to investigate the break in at the Scott residence. Following the break in at Benny's Laundry, law enforcement began surveillance of Dioneff's residence. Deputy Kemmerle had observed the Cunha's blue Chevy Lumina at the residence and was familiar with it.
 {¶ 64} Deputy Kemmerle learned that Scott's credit cards had been used twice the same day of the break in, at Sheetz and Speedway convenience stores in Ashtabula. Kemmerle obtained the surveillance video from Sheetz showing a Chevy Lumina enter the parking lot. Dioneff, Cunha, Manis, and two other persons, Jennifer Bennett and James Kilpatrick, were in the Lumina. The video also showed Cunha using one of Scott's credit cards to purchase food and cigarettes. Video from the Speedway *Page 19 
showed the same individuals occupying the same Lumina and Cunha making a further purchase of cigarettes with one of Scott's credit cards.
 {¶ 65} Thus, there is sufficient evidence that Dioneff trespassed in an occupied structure with purpose to deprive the Scotts of firearms and credit cards.
 {¶ 66} Dioneff was charged with Burglary, third degree Grand Theft, and fifth degree Theft for the January 25, 2006 burglary of the Sency residence at 6145 Depot Road, Saybrook. Mark Sency testified that, while he was at work, persons entered his home by kicking in the front door. Sency testified that the persons had taken several guns, including a .300 Weatherby, and a nail gun.
 {¶ 67} Marvin W. and Brenda Keen testified at trial that, on January 25, 2006, Dioneff came to their home at 1130 Columbus Avenue, Ashtabula, accompanied by Kilpatrick and Manis. Dioneff offered to sell Marvin some guns, including a .300 Weatherby, and a nail gun. While Dioneff negotiated with Marvin, Manis took Kilpatrick, dropped him off somewhere, and returned to the Keen residence. After concluding a deal with Marvin, Dioneff asked Brenda to drive him to the Freeway Motel. Brenda did so in her Buick. Manis followed in the Lumina. While en route to the motel, Deputy Kemmerle recognized the Lumina and observed it following the Buick. Kemmerle attempted to stop both vehicles. Dioneff exited the Buick and attempted to flee on foot but was apprehended. The print on the shoes Dioneff was wearing at the time of his arrest matched the prints left in the snow on the porch of the Sency residence.
 {¶ 68} Manis escaped in the Lumina and returned to Dioneff's residence. After speaking with Brenda, the police went to the Keen residence and seized the guns and nail gun. Sheriff's deputies went to Dioneff's Pierpont residence, where they arrested *Page 20 
Cunha, Manis, and Bennett, and seized additional firearms, including firearms stolen from the Scott residence. Kilpatrick was also subsequently arrested at his apartment.
 {¶ 69} Thus, there is sufficient evidence that Dioneff trespassed in an occupied structure with purpose to deprive Sency of firearms and property worth less than $500.
 {¶ 70} Finally, in order to find that Dioneff had committed the crime of Engaging in a Pattern of Corrupt Activity, the State was required to prove, beyond a reasonable doubt, that Dioneff, in association with "any enterprise, * * * conducted] or participate[d] in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." R.C. 2923.32(A)(1).
 {¶ 71} "Enterprise" is defined as "any * * * group of persons associated in fact although not a legal entity" and "includes illicit as well as licit enterprises." R.C. 2923.31(C). "Corrupt activity" is defined to include conduct constituting Burglary, Theft of the third and fourth degree, and Breaking and Entering. R.C. 2923.31(I)(2)(a) and (c). A "[p]attern of corrupt activity" is defined as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). "If at least one of the incidents of corrupt activity is a felony of the * * * third degree, * * * engaging in a pattern of corrupt activity is a felony of the first degree." R.C. 2923.32(B)(1).
 {¶ 72} In the present case, the evidence as described above is sufficient to prove that Dioneff, in association with a group of persons, including Cunha, Zepeda, Manis, Corey, and Kilpatrick, conducted and participated in the affairs of that enterprise, which *Page 21 
affairs constituted Burglary, Theft, and Breaking and Entering. Specifically, the evidence presents twelve instances of the enterprise engaging in distinct criminal acts over a two month period. Dioneff was directly involved in every incident of corrupt activity.
 {¶ 73} For the foregoing reasons, Dioneff's convictions are supported by sufficient evidence. Dioneff's first and third assignments of error are without merit.
 {¶ 74} Under the challenge to the manifest weight of the evidence, Dioneff argues that all the witnesses against him face "serious problems with credibility and reliability." We disagree. Although many of the witnesses against Dioneff were potentially biased, it is not at all certain that their potential biases compromised their testimony, much less rendered it unbelievable.
 {¶ 75} In three instances (Benny's Coin Laundry, the Scott residence, and the Sency residence), Dioneff's involvement with the crimes was established independent of the testimony of Cunha or other potentially hostile witnesses. In the instances where Cunha's testimony was essential, her testimony was often corroborated by other evidence, the victims' testimony, or the police investigation. For example, in the case of the Miller residence, Miller had not reported the break in to the police. Cunha first identified the Miller residence to detectives and aided in the recovery of jewelry taken from the residence before Miller acknowledged that a break-in had occurred. In the case of the Boytz and Schilling residences, Cunha's testimony was corroborated by the recovery of physical evidence from Cunha's mother (jewelry) and her residence (the jug full of coins) respectively. *Page 22 
 {¶ 76} These particular examples are sufficient to establish that Cunha's testimony was not completely lacking in credibility. As has often been said, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."State v. DeHass (1967), 10 Ohio St.2d 230, at paragraph one of the syllabus. In the present case, the jury had determined the testimony of Cunha, Manis, and the others to be credible. We find no miscarriage of justice.
 {¶ 77} The second assignment of error is without merit.
 {¶ 78} Under Dioneff's fourth and final assignment of error, he argues that his aggregate sentence of twenty-seven years is not proportionate to the seriousness of his crimes and, so, unconstitutional under theEighth Amendment to the United States Constitution.
 {¶ 79} "A punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community." State v. Chaffin (1972), 30 Ohio St.2d 13, at paragraph three of the syllabus. "Eighth Amendment violations are rare and instances of cruel and unusual punishment are limited to those punishments, which, under the circumstances, would be considered shocking to any reasonable person." State v. Rhodes, 11th Dist. No. 2000-L-089, 2001-Ohio-8693, 2001 Ohio App. LEXIS 5650, at *21 (citation omitted). "As a general rule, sentences that fall within the statutory range do not violate the constitutional provision regarding excessive punishments." State v. Bengal, 11th Dist. No. 2006-L-123, 2007-Ohio-2691, at ¶ 17 (citation omitted). *Page 23 
 {¶ 80} Given the facts of the present case, there is nothing shocking about the lower court's imposition of an aggregate prison sentence of twenty-seven years. This sentence is within the statutory range for each of thirty counts of the indictment and the decision to run certain sentences consecutively is within the trial court's discretion.State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, at paragraph seven of the syllabus.
 {¶ 81} Moreover, the trial court carefully considered the seriousness and recidivism factors contained in R.C. 2929.12 in rendering its sentence. In particular, the court noted that Dioneff exhibited a lack of remorse; Dioneff has an extensive criminal record including prior prison sentences; the offenses were committed as part of an organized criminal activity; Dioneff was on probation for felony charges in Texas when he committed the current offenses; Dioneff used his relationship with some of the victims to facilitate the offenses; Dioneff has not responded favorably to prior efforts at rehabilitation, and the economic and psychological harm suffered by the victims.
 {¶ 82} Dioneff's fourth assignment of error is without merit.
 {¶ 83} For the foregoing reasons, Dioneff's multiple convictions for Engaging in a Pattern of Corrupt Activity, Burglary, Grand Theft, Theft, Breaking and Entering, and Conspiracy to Commit Burglary, and his aggregate prison sentence of twenty-seven years on these counts, are affirmed.
 CYNTHIA WESTCOTT RICE, P.J., COLLEEN MARY O'TOOLE, J., concur. *Page 1