[Cite as *State v. Lane*, 2014-Ohio-2010.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-G-3144** |
| THOMAS M. LANE, III, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Geauga County Court of Common Pleas, Case No. 12 C 000058.

Judgment: Affirmed.

*James R. Flaiz,* Geauga County Prosecutor, *Craig A. Swenson* and *Nicholas A. Burling,* Assistant Prosecutors, Courthouse Annex, 231 Main Street, Suite 3A, Chardon, OH 44024 (For Plaintiff-Appellee).

*Michael A. Partlow,* 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1}  Appellant, Thomas M. Lane, III, appeals his conviction in the Geauga County Court of Common Pleas following his guilty plea to three counts of aggravated murder, two counts of attempted aggravated murder, and felonious assault. Appellant's conviction resulted from a shooting at Chardon High School in which he killed three students, paralyzed another, and injured two others. At the time of the offenses, appellant was 17 years old. At issue is whether Ohio's mandatory juvenile bindover

statutes, at R.C. 2152.10 and R.C. 2152.12, are unconstitutional and whether appellant's sentence to life in prison without parole violates the prohibition against cruel and unusual punishment. For the reasons that follow, we affirm.

**Substantive Facts and Procedural History**

{¶2} On March 1, 2012, a complaint was filed in the Geauga County Juvenile Court, charging appellant with three counts of aggravated murder by shooting and killing three students at Chardon High School, two counts of attempted aggravated murder against two other students, and one count of felonious assault against another student. On the same date, the state moved to transfer this case to the General Division of the Court of Common Pleas for appellant to be tried as an adult.

{¶3} On March 21, 2012, the juvenile court ordered Phillip Resnick, M.D., forensic psychiatrist, to complete a competency evaluation to determine whether appellant was competent to assist his attorneys in the juvenile court proceedings. On May 2, 2012, the juvenile court held a competency hearing. Following the hearing, the court found that appellant was competent for purposes of the juvenile proceedings.

{¶4} On May 24, 2012, the juvenile court held a bindover hearing. Following the hearing, the court found that appellant was 17 years old on the date of the alleged offenses. The court also found that probable cause existed to believe that appellant committed three counts of aggravated murder and two counts of attempted aggravated murder, which are "category one offenses" under R.C. 2152.02(B)(B), mandating bindover under R.C. 2152.10 and R.C. 2152.12. As a result, the juvenile court transferred appellant's case to the general division.

{¶5} On June 4, 2012, appellant was indicted in a six-count indictment charging him with aggravated murder of Demetrius Hewlin, an unclassified felony, in violation of R.C. 2903.01(A) (Count One), with a multiple-killings death penalty specification, in violation of R.C. 2929.04(A)(5), and a firearm specification, in violation of R.C. 2941.145(A); aggravated murder of Russell King, Jr. (Count Two), with the same death penalty specification and a firearm specification; aggravated murder of Daniel Parmertor (Count Three), with the same death penalty specification and a firearm specification; attempted aggravated murder of Nate Mueller, a felony of the first degree, in violation of R.C. 2903.01(A) and R.C. 2923.02(A) (Count Four), with a firearm specification; attempted aggravated murder of Nicholas Walczak (Count Five), with a firearm specification; and felonious assault of Joy Rickers, a felony of the second degree, in violation of R.C. 2903.11(A)(2) (Count Six), with a firearm specification. Appellant pled not guilty. Subsequently, he pled not guilty by reason of insanity.

{¶6} On February 8, 2013, appellant filed a motion for an order referring him for a competency evaluation by the Psycho-Diagnostic Clinic. The court granted the motion. In her evaluation, Lynn A. Luna Jones, Ph.D., forensic psychologist, concluded that appellant was competent to stand trial.

{¶7} On February 26, 2013, the trial court held a competency hearing, after which the court found appellant was competent to stand trial. Later that day, he filed a written guilty plea and the court held a change-of-plea hearing. After waiving his rights, appellant withdrew his plea of not guilty by reason of insanity, and pled guilty to each count of the indictment. Pursuant to the parties' plea bargain, appellant pled guilty to the aggravated murder of Demetrius Hewlin, Russell King, Jr., and Daniel Parmertor in

3

Counts One, Two, and Three, respectively, and the firearm specifications to those counts. Further, appellant pled guilty to attempted aggravated murder of Nate Mueller and Nicholas Walczak in Courts Four and Five, respectively, and the firearm specifications to those counts. Finally, appellant pled guilty to Count Six, felonious assault of Joy Rickers, and the firearm specification to that count. In exchange for his plea, the death penalty specifications were dismissed.

{¶8} In support of the factual basis for the guilty plea, the state offered: (1) the video recording of appellant's crimes, (2) the dash cam video of his apprehension by Geauga County Sheriff's Deputy Jon Bilicic, and (3) the video of appellant's confession given to detectives at the Geauga County Safety Center.

{¶9} The video taken from a security camera in the school cafeteria shows that on February 27, 2012, at about 7:30 a.m., appellant is sitting alone at a table in the cafeteria with his book bag on the table. He watches a group of eight to nine students who are talking to each other at a nearby table. Appellant then moves to a table directly behind this group of students and continues to watch them. One of these students, Nick Walczak, is standing at the end of the table and the others are seated, some with their backs to appellant and others facing in his direction.

{¶10} After watching these students for about eight minutes, appellant goes through his book bag. He pulls out a handgun and a knife, stands, aims his gun at the group of students in front of him, and starts shooting. Appellant shoots Russell King in the back of the head. He also shoots Nick Walczak who falls to the floor. Appellant then walks around his table and along the victims' table while repeatedly shooting at them. He shoots Demetrius Hewlin in the head and also shoots Daniel Parmertor in the head.

4

Two other students, Nate Mueller and Joy Rickers, are also shot. Everyone in the cafeteria runs out. Appellant also runs out of the cafeteria with his gun and knife.

{¶11} The video taken by a security camera in the adjoining hallway shows a large group of students running frantically from the cafeteria and down the hallway. While Nick Walczak is limping down the hallway, appellant runs up to him from behind and shoots him again, this time in the back of his neck at close range. While appellant is running up to Nick, one can see across the chest of appellant's long-sleeve, pullover shirt in large bold letters the word, "Killer." Nick falls to the floor and appellant runs away from him.

{¶12} Meanwhile, Deputy Bilicic, while on routine patrol, was advised of the shooting and given a description of the suspect. The deputy was told that the suspect had fled the high school. At about 8:30 a.m., Deputy Bilicic was dispatched to Woodin Road, about one mile from the school, and advised the suspect was at that location. When Deputy Bilicic approached the area, he saw appellant sitting on the side of the road with his handgun and knife near him. After Deputy Bilicic advised appellant of his Miranda rights, he said he just shot people at the high school.

{¶13} Deputy Bilicic drove appellant to the Geauga County Safety Center where he was interviewed by two Geauga County Sheriff's detectives. After again being advised of his Miranda rights, appellant said that at about 7:00 that morning, he rode the school bus to Chardon High School. He went in the school with a .22-caliber, semiautomatic Ruger handgun and a knife he had put in his book bag. He said he brought the gun because he planned to shoot people. He brought the knife in case he needed another weapon while reloading his gun. He said he went in and out of the

5

bathroom three times because he wanted to shoot students and was thinking about doing it. He said that when he left the bathroom for the last time, he sat alone at a table directly behind a group of students he was going to shoot so he would be close to them.

{¶14} Appellant said that at about 7:30 a.m., he switched the safety off on the gun. He then pulled his pistol and knife out of his book bag. He stood up and, while aiming at the group, fired all ten rounds in the clip. He realized he needed to reload his gun so he ran out of the cafeteria. Appellant said that as he left the cafeteria, an adult cafeteria monitor started following him so appellant spun around and aimed his gun at him so he would not chase him. Appellant then ran down the hallway and exited the building.

{¶15} Appellant said that after he ran out of the school, he dropped the empty clip out of the gun and loaded it with a second clip. He ran into the woods until he reached a road. He sat down on the side of the road until Deputy Bilicic approached him.

{¶16} Appellant said he did not know why he did this. He said he does not have problems with anyone and was not upset with anyone. He said that no one had bullied him. This was just something he chose to do. He said that by doing this he was trying to accomplish something. He said he created this goal and he needed to see it through. He said he had been thinking about doing this for about two weeks.

{¶17} Appellant said he stole the gun the day before the shooting from his uncle while he was visiting him. He also stole a second magazine and a handful of bullets that were stored with the gun. When he stole the gun it was empty. The night before

the shooting, he loaded both magazines and put one of them in the gun. He put the gun in his book bag that morning because he felt he would probably shoot people.

{¶18} Appellant said he did not choose any particular people to shoot. Rather, he said he shot at a random group of people. He said that, while he had seen these students before, he did not know them. He said he aimed at their heads so they would die quicker and not suffer.

{¶19} Appellant said he attended Chardon High School for the first half of ninth grade. Since then, he has attended Lake Academy, an alternative high school in Willoughby. He decided to go there because Lake Academy gives its students the option of working while going to school. He said he planned to work and earn money to go to college. Every school day, he takes the school bus to Chardon High School, which arrives there at about 7:00 a.m. He does not take classes there. He just waits in the cafeteria for about one-half hour until 7:30 a.m., when he catches a bus that takes him to Auburn Career Center in Concord Township. From there, he takes another bus to Lake Academy. Appellant said he shot the students while he was waiting for the bus to take him to Auburn Career Center.

{¶20} Appellant said he is in the eleventh grade, but also takes twelfth grade classes. He was going to graduate that year so he would be graduating early. He was planning to go to college to study psychology. He believes he is more mature than others his age.

{¶21} Appellant said he bought the shirt with the word "Killer" printed across the chest about one week earlier. He said he wore it today because he was going to be shooting people.

{¶22} In response to the detectives' questions, appellant insisted he never shot anyone while he was running down the hallway.

{¶23} Appellant said he shot a lot of bullets into a small group of people and thought someone would be killed. He said he knows what he did was wrong; he feels terrible for doing it; and he has regret.

{¶24} Appellant said he has lived with his maternal grandparents since he was about three years old. He said that at that time, the court decided his parents were not fit to raise him and his grandparents were awarded custody.

{¶25} Dr. Lynn A. Luna Jones of the Psycho-Diagnostic Clinic stated in her competency report that during appellant's prior competency evaluation with Dr. Resnick, appellant told him that he had heard voices and experienced delusions. However, appellant admitted to Dr. Jones that he has never actually experienced any of these symptoms. Appellant admitted he "lied" to Dr. Resnick when he told him he had heard voices. With regard to appellant's report to Dr. Resnick that he experienced anxiety and confusion, he denied that he ever felt that way. He also denied he had any prior fears of losing his mind, as he had previously reported. Appellant said he reported these symptoms because he was trying to appear schizophrenic. Finally, he said he lied about his report of being a victim of sexual abuse because he thought it "couldn't hurt" to say he was.

{¶26} Appellant said he was able to successfully manipulate Ravenwood mental health staff at the jail to believe he was mentally ill. He said he feigned symptoms of being depressed, suicidal, sexually abused, psychotic, and schizophrenic. He said he was able to "force [himself] to cry when necessary to convince staff he was depressed."

He said he told staff he was claustrophobic so he could be put in with the general jail population instead of being segregated from the other inmates. Regarding the voices he reported to staff at the Geauga County Safety Center, appellant said he "made it all up."

{¶27} When Dr. Jones asked appellant why he decided to change his report of mental health symptoms, he said he "was afraid that if [he] didn't come clean, they wouldn't let me change my plea to guilty."

{¶28} Dr. Jones concluded that appellant has no mental condition or defect and has no signs of delusions, hallucinations, anxiety, depression, or psychosis. She further concluded that appellant fabricated these symptoms in order to evade prosecution.

{¶29} The court found that appellant voluntarily entered his guilty plea; accepted his guilty plea; and found him guilty of each count of the indictment. The court ordered a pre-sentence report and scheduled the matter for sentencing.

{¶30} The case proceeded to sentencing on March 19, 2013. After taking his seat at the defense table, appellant took off his dress shirt, revealing an undershirt with the word "Killer" written on it similar to the shirt he wore on February 27, 2012. Appellant's counsel told the court that appellant is now 18 years old, and had instructed him not to present any mitigation on his behalf. Instead, he said appellant wanted to make a statement on his own behalf. Counsel said that he had urged him not to make the statement he expected appellant to make, but that he has the right to make it.

{¶31} Appellant told the court he voluntarily and against the advice of his counsel waived his right to present information in mitigation of punishment. Appellant then turned around and, with his middle finger raised toward the victims' families, said to

9

them: "This hand that pulled the trigger, that killed your sons, now masturbates to the memory. F_ _ _ all of you."

{¶32} Phyllis Ferguson, Demetrius Hewlin's mother, stated that appellant's murder of her son has devastated the lives of every member of their family. She spoke of how kind and unselfish Demetrius was. Ms. Ferguson said that whenever her back hurt, Demetrius would put her shoes on and tie them for her. She said that appellant stole her son's life and he should never be allowed to do this to anyone again.

{¶33} Holly Walczak, Nick Walczak's mother, while looking at appellant, said, "You can smile all you want." She told appellant that because he took a gun to school and shot innocent students, he changed the lives of every member of her family and their quiet, peaceful town will never be the same. Her son is now paralyzed and confined to a wheelchair. She said that Nick had driven appellant home from school and was always kind to him, and she asked appellant why he would want to hurt Nick. She thus debunked appellant's statement to the detectives that he did not know his victims. She told the court she watches her son suffer daily as a result of his injuries. She asked the court to never release appellant from prison because he is dangerous and has caused too much pain.

{¶34} Crystal King, Russell King's older sister, told the court that the murder of her brother has been the most difficult thing she has ever had to endure. She said she was driving to work on February 27, 2012, when her fiancé called her and said there had been a shooting at the high school. She called Russell's cell phone over and over, but there was no answer. She called her father. When he answered, he could hardly breathe. She asked if he had heard anything, and he said, "he's been shot." Her

parents picked her up from work and drove her to the hospital. The doctor said it was very bad. He said Russell had been shot in the head and was in surgery and if he made it, he would be disabled. They went in the waiting room, which was filled with so many people, the hospital staff moved them to a conference room. She said she does not remember seeing any faces, just a sea of friends and family members that filled the entire hallway. Realizing that all these people were there for her brother brought tears to her eyes. She then returned to Russell's room. As she walked in, her mother was yelling, "no, no, no," over and over again. Crystal learned that Russell had just passed away. She said that appellant took not only the life of her only sibling and her parents' only son, he also took the sense of safety from every parent in the community who sends their children to school. She said that appellant took so much away from so many people, he deserves to spend the rest of his life in prison without parole. Like Holly Walczak, Crystal said that Russell and appellant used to be friends, again contradicting appellant's statement to police that he did not know his victims.

{¶35} Finally, Dina Parmertor, Daniel Parmertor's mother, told the court that appellant murdered her son Danny who was just 16 years old. She said she will suffer the rest of her life without her son. She is in pain every minute of every day. She no longer wants to enjoy life or visit with family and friends. She will never be the same because of appellant. She said that appellant has stolen her life. She said he also stole Danny from his little brother and sister. Her younger children do not see the mother they used to know because she is in constant anguish. They want to help her, but they are in too much pain themselves. She said she sees no remorse from appellant.

{¶36} The court sentenced appellant on Count One, the aggravated murder of Demetrius Hewlin, to life in prison without parole; on Count Two, the aggravated murder of Russell King, Jr., to life in prison without parole; and on Count Three, the aggravated murder of Daniel Parmertor, to life in prison without parole. With respect to Count Four, the attempted aggravated murder of Nate Mueller, the court sentenced appellant to eight years in prison. On Count Five, the attempted aggravated murder of Nick Walczak, the court found that, after shooting Nick, appellant chased him down the hallway as Nick was running for his life. Appellant sprinted up behind him and shot him from behind. Nick is now paralyzed and confined to a wheelchair. The court noted that appellant's conduct merits the maximum sentence of 11 years in prison. On Count Six, the felonious assault of Joy Rickers, the court sentenced appellant to six years in prison. Each of these prison terms was ordered to be served consecutively to each other.

{¶37} The court also imposed three-year prison terms for four of the firearm specifications to Counts One, Two, Three, and Five, the aggravated murders and the attempted aggravated murder of Nick Walczak, based on appellant's overall objectives in his criminal enterprise and the serious injuries he inflicted. The court noted that these four victims suffered the most extreme injury, the three murdered victims having lost their lives and Nick being confined to a wheelchair. These terms were ordered to be served consecutively to the prison terms imposed for each of the four underlying felonies.

{¶38} Thus, in addition to the three life terms for the aggravated murders, the court imposed a total of 25 years in prison on the other offenses and 12 years for the

12

firearm specifications, all of which were ordered to be served consecutively, for a total of 37 years in prison.

{¶39} Appellant appeals his conviction and sentence, asserting four assignments of error. Because his first two assigned errors are related, they are considered together. They allege:

{¶40} "[1.] THE JUVENILE TRIAL COURT COMMITTED PLAIN, REVERSIBLE ERROR BY BINDING APPELLANT OVER TO THE COURT OF COMMON PLEAS TO BE TRIED AS AN CONSTITUTIONAL RIGHTS (SIC).

{¶41} "[2.] THE TRIAL COURT COMMITTED PLAIN ERROR, AS A MATTER OF LAW, BY SENTENCING APPELLANT TO THREE TERMS OF INCARCERATION OF LIFE WITHOUT THE POSSIBILITY OF PAROLE, IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS."

**Effect of Appellant's Guilty Plea on His Constitutional Challenge to Mandatory Bindover**

{¶42} As a preliminary matter, the state argues that because appellant pled guilty, he waived the right to challenge the constitutionality of Ohio's mandatory bindover statutes, at R.C. 2152.10 and R.C. 2152.12. In support, the state cites *State v. Quarterman*, 9th Dist. Summit No. 26400, 2013-Ohio-3606, *discretionary appeal allowed at* 137 Ohio St.3d 1440, 2013-Ohio-5678, in which the Ninth District held that by pleading guilty, the juvenile defendant, whose case had been bound over to the general division, waived his right to challenge the constitutionality of Ohio's mandatory bindover provisions and his attorney's failure to object to their application. *Id.* at ¶8.

13

**{¶43}** However, this court in *State v. Platt*, 11th Dist. Portage No. 89-P-2065, 1990 Ohio App. LEXIS 3508 (Aug. 17, 1990), rejected this argument. In *Platt*, this court held that a voluntary guilty plea waives all defects in the case, except the lack of subject matter jurisdiction of the court that accepted the plea. *Id.* at *4-*5. Further, this court held that by entering a guilty plea, a juvenile does not waive objections to constitutional deficiencies in the bindover hearing wherein the juvenile court transferred jurisdiction to the general division. *Id.* at *5-*6. *Accord State v. Riggins*, 68 Ohio App.2d 1 (8th Dist.1980), paragraph two of the syllabus.

**{¶44}** Thus, appellant's challenge to the constitutionality of Ohio's mandatory bindover statutes is properly before this court.

**Ohio's Mandatory Bindover of Juvenile Offenders**

**{¶45}** Appellant argues that Ohio's mandatory bindover statutes are unconstitutional in that they allegedly violate due process and equal protection and the right to be free from cruel and unusual punishment. We do not agree.

**{¶46}** A duly enacted Ohio statute enjoys "a strong presumption of constitutionality." *State v. Collier*, 62 Ohio St.3d 267, 269 (1991). Further, where reasonably possible, courts must interpret challenged statutes so as to avoid constitutional infirmities. *Akron v. Rowland*, 67 Ohio St.3d 374, 380 (1993). Before a court may declare a statute unconstitutional, the party challenging its constitutionality bears the heightened burden of proving beyond a reasonable doubt that a clear conflict exists between the legislation and some particular constitutional provision. *State v. May*, 11th Dist. Ashtabula No. 2005-A-0011, 2006-Ohio-3406, ¶19; *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142 (1955), paragraph one of the syllabus.

14

Accordingly, there is a strong presumption that Ohio's mandatory bindover statutes are constitutional. Further, the constitutionality of a statute is a matter of law that we review de novo. *State v. Jenson*, 11th Dist. Lake No. 2005-L-193, 2006-Ohio-5169, ¶5.

{¶47} R.C. 2152.02(BB) provides that a "category one offense" means aggravated murder, murder, attempted aggravated murder, or attempted murder.

{¶48} Further, R.C. 2152.10(A)(1)(a) provides that a child who is alleged to be a delinquent child is eligible for mandatory transfer and shall be transferred pursuant to R.C. 2152.12 if the child is charged with a category one offense, and the child was at least 16 years old at the time of the offense.

{¶49} Moreover, R.C. 2152.12(A)(1)(a)(i) provides that after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult, the juvenile court at a hearing shall transfer the case to the general division if the child was 16 or 17 years old at the time of the offense and there is probable cause to believe that the child committed the offense. In explaining this statute, the Supreme Court of Ohio has stated:

{¶50} [The juvenile] court has a duty to transfer a case when it determines that the elements of the transfer statute are met, to wit: (1) the charged act would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult, (2) the child was 16 or 17 at the time of the act, [and] (3) there is probable cause to believe that the child committed the act

15

charged. R.C. 2152.12(A)(1)(a). *In re A.J.S.*,120 Ohio St.3d 185, 2008-Ohio-5307, ¶22.

**Appellant's Due Process Challenge to Mandatory Bindover**

{¶51} First, appellant argues that Ohio's mandatory bindover statutes violated his right to due process. Although he does not expressly state whether his argument is based on procedural or substantive due process, we interpret it as based on the former. *State v. Lee*, 11th Dist. Lake No. 97-L-091, 1998 Ohio App. LEXIS 4250, *12 (Sep. 11, 1998).

{¶52} Procedural due process under the Fourteenth Amendment to the United States Constitution and Section 15, Article I of the Ohio Constitution are identical and require that, before the state can divest a person of a right, he or she must be given notice and an opportunity to be heard. *Lee, supra.*

{¶53} Appellant argues his due process rights were violated because Ohio's bindover statutes do not provide for an amenability hearing at which the court considers the factors set forth in *Kent v. United States*, 383 U.S. 541 (1966), before the juvenile court orders a bindover.

{¶54} In *Kent*, the District of Columbia's bindover statute provided that the juvenile court may waive its jurisdiction over the juvenile, but did not provide any definitive bindover procedures. After a motion for a bindover was filed, the judge summarily and without any hearing or explanation ordered the juvenile to be held for trial as an adult. The juvenile was then tried and convicted. The court of appeals affirmed. The Supreme Court of the United States reversed the conviction on the ground that due process required more procedure than was provided to the juvenile. *Id.*

16

at 556. The Supreme Court in *Kent* held that in order to satisfy due process: (1) the juvenile court must hold a hearing, (2) at which the juvenile is represented by counsel, and (3) the juvenile court must provide a statement of reasons for its bindover decision. *Id.* at 557. Further, the Court in *Kent* held that in deciding whether to order a bindover, the juvenile court should consider certain listed factors. *Id.* at 566-567.

{¶55} As noted above, appellant argues that, pursuant to *Kent*, due process required an amenability hearing before he could be bound over to the general division. However, this court in *Lee*, *supra*, held that *Kent* does not stand for this proposition. *Lee*, *supra*, at *15. As in this case, the defendant in *Lee* argued that Ohio's mandatory bindover statutes violated due process because, in his view, he was entitled to an amenability hearing pursuant to *Kent.* However, this court in *Lee* held that the defendant was granted the procedural protections required by *Kent* because a probable cause hearing was held at which the defendant was represented by counsel and the trial court made findings of fact in support of its order transferring jurisdiction to the general division. *Lee*, *supra*, at *15-*16. Further, this court in *Lee* held that due process does not require an amenability hearing. *Id.* at *16.

{¶56} Moreover, the Third District in *State v. Kelly*, 3d Dist. Union No. 14-98-26, 1998 Ohio App. LEXIS 5630 (Nov. 18, 1998), also held that Ohio's mandatory bindover statutes do not violate due process. *Id.* at *22. As in the instant case, the defendant in *Kelly* argued that, because the mandatory bindover statutes do not provide for an amenability hearing at which juvenile courts are required to consider the factors listed in *Kent*, *supra*, Ohio's mandatory bindover statutes violate due process.

17

{¶57} The Third District in *Kelly* noted that the bindover statute at issue in *Kent* involved *discretionary*, rather than mandatory, bindovers. The court in *Kelly* stated that, because the *Kent* factors were intended to address the problem of arbitrary decision-making and disparate treatment in discretionary bindover determinations, due process does not require use of these factors when the legislature has statutorily eliminated discretionary bindover determinations. *Id.* at *19-*20.

{¶58} The Third District in *Kelly* stated that due process does not require a weighing of specific factors prior to a transfer; it merely requires that such transfers not be made on an arbitrary basis. *Id.* at *20. Thus, the court held that due process does not prevent the General Assembly from eliminating the weighing of the *Kent* factors for certain serious offenses, provided that removal is rationally related to a legitimate governmental purpose. *Id.* The court stated that, because an amenability hearing using the *Kent* factors is not a fundamental right, the rational basis test applies, and, in applying that test, the court held that Ohio's mandatory bindover statutes are rationally related to the legitimate governmental objective of deterring violent juvenile crime. *Id.*

{¶59} The court in *Kelly* held that the procedural prerequisites to transfer described in *Kent*, i.e., representation by counsel, a hearing, and a statement of reasons, are provided for in Ohio's mandatory bindover statutes. *Kelly*, *supra*, at *21. Thus, the Third District held that the elimination of a separate amenability hearing does not violate procedural due process. *Id.*

{¶60} Further, the Second and Ninth Districts have also held that Ohio's mandatory bindover statutes do not violate due process. *State v. Ramey*, 2d Dist. Montgomery No. 16442, 1998 Ohio App. LEXIS 2617, *2-*3 (May 22, 1998); *State v.*

*Collins*, 9th Dist. Lorain No. 97CA006845, 1998 Ohio App. LEXIS 2474, *5 (June 3, 1998).

**{¶61}** Moreover, appellant does not cite any case law holding that a mandatory bindover statute violates due process.

**{¶62}** Here, appellant was represented by counsel at a probable cause hearing held by the juvenile court. Further, the juvenile court's judgment entry included findings of fact supporting its decision transferring the matter to the general division. Based on the foregoing authority, Ohio's mandatory bindover statutes do not violate due process.

**Appellant's Equal Protection Challenge to Mandatory Bindover**

**{¶63}** Next, appellant argues that Ohio's mandatory bindover statutes violated his right to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution.

**{¶64}** The standard for determining if a statute violates equal protection is "essentially the same under state and federal law." *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 353 (1994). "Under a traditional equal protection analysis, class distinctions in legislation are permissible if they bear some rational relationship to a legitimate governmental objective. Departures from traditional equal protection principles are permitted only when burdens upon suspect classifications or abridgements of fundamental rights are involved." *State ex rel. Vana v. Maple Hts. City Council*, 54 Ohio St.3d 91, 92 (1990). The bindover statutes do not affect a suspect class (e.g., race or gender) or a fundamental right (e.g., speech or religion). *Lee, supra*, at *17. In fact, appellant concedes the rational basis test applies to his equal-protection

19

challenge. Thus, the bindover statutes need only bear a rational relationship to a legitimate governmental purpose *Adkins v. McFaul*, 76 Ohio St.3d 350, 351 (1996).

**{¶65}** Appellant argues that no rational basis exists for the disparate treatment in the bindover statutes of juveniles who are 14 or 15 years old as opposed to those who are 16 or 17 years old. Under the bindover statutes, juveniles who are 16 or 17 are subject to mandatory bindover if probable cause exists to believe they committed a category one offense. In contrast, similarly-situated juveniles who are 14 or 15 are only subject to mandatory bindover if they were previously adjudicated delinquent and committed to the department of youth services for committing a category one offense. R.C. 2152.10(A)(1)(b).

**{¶66}** Appellant contends that this disparate treatment is not supported by scientific evidence. However, as the party challenging the constitutionality of the statutes, appellant had the burden to prove beyond a reasonable doubt that the statutes are unconstitutional, i.e., that the subject classification is not rationally related to a legitimate governmental objective. Because appellant failed to meet this burden, he failed to rebut the strong presumption that Ohio's mandatory bindover statutes are constitutional.

**{¶67}** In any event, the purpose of this legislation is to protect society and reduce violent crime by juveniles. *Lee, supra*, at *17. Contrary to appellant's argument, juveniles who are 14 or 15 are markedly different from those who are 16 or 17 in many ways, e.g., in terms of physical development and maturity. Juveniles who are 14 years old are typically still immature, while those who are 17, or in appellant's case, 17 and one-half years old, are nearly adults. Thus, the legislature's decision to single out older

juvenile homicide offenders, who are potentially more street-wise, hardened, dangerous, and violent, is rationally related to this legitimate governmental purpose.

{¶68} Further, this court in *Lee*, *supra*, has held that Ohio's mandatory bindover statutes do not violate equal protection. *Id.* at *17. In addition, the Second, Third, and Ninth Districts have likewise held that Ohio's mandatory bindover statutes do not violate equal protection. *Ramey*, *supra*; *Kelly*, *supra*, at *26-*27; *Collins*, *supra*, at *5.

{¶69} Moreover, appellant does not cite any case law holding that a mandatory bindover statute violates equal protection.

{¶70} In view of the foregoing analysis, Ohio's mandatory bindover statutes do not violate equal protection.

**Appellant's Eighth Amendment Challenge to Mandatory Bindover**

{¶71} Next, appellant argues his bindover under Ohio's mandatory bindover statutes and his sentence to life in prison without parole violated the prohibition against cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution. "'A punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community.'" *State v. Dioneff*, 11th Dist. Ashtabula No. 2006-A-0063, 2007-Ohio-3387, ¶79, quoting *State v. Chaffin*, 30 Ohio St.2d 13 (1972), paragraph three of the syllabus. "'Eighth Amendment violations are rare and instances of cruel and unusual punishment are limited to those punishments, which, under the circumstances, would be considered shocking to any reasonable person.'" *Dioneff*, *supra*, quoting *State v. Rhodes*, 11th Dist. Lake No. 2000-L-089, 2001 Ohio App. LEXIS 5650, *21 (December 14, 2001).

Sentences that fall within the statutory range cannot amount to cruel and unusual punishment. *State v. Bengal*, 11th Dist. Lake No. 2006-L-123, 2007-Ohio-2691, ¶17; *State v. Gladding*, 66 Ohio App.3d 502, 513 (11th Dist.1990); *State v. Long*, 1st Dist. Hamilton No. C-110160, 2012-Ohio-3052, ("*Long I*"), *reversed on other grounds at* ____Ohio St.3d ____, 2014-Ohio-849.

{¶72} With respect to appellant's argument that his mandatory bindover constituted cruel and unusual punishment, he does not cite any case law holding that the mandatory transfer of juveniles to the general division without an amenability hearing constitutes punishment, let alone cruel and unusual punishment.

{¶73} The prohibition against cruel and unusual punishment by its very terms applies only to punishments. The word "punishment" has been defined as follows: "In criminal law[, a]ny * * * penalty * * * or confinement inflicted upon a person by authority of the * * * sentence of a court, for some crime or offense committed by him * * *." Black's Law Dictionary 1398 (4th Ed. Rev. 1968). Further, "[m]andatory bindover does not equate to punishment any more than the mere prosecution of an adult in the common pleas court constitutes punishment." *Quarterman*, *supra*, at ¶16 (J. Carr, concurring).

{¶74} Because appellant's mandatory bindover was not a penalty or confinement inflicted on him pursuant to a sentence of the juvenile court, it was not a punishment, and appellant's mandatory bindover did not constitute cruel and unusual punishment.

22

**Appellant's Eighth Amendment Challenge to his Life-Without-Parole Sentence**

{¶75} Appellant cites no case law holding that a sentence of life without parole imposed on a juvenile following his or her conviction of an intentional homicide amounts to cruel and unusual punishment. Instead, he relies on a trilogy of cases decided by the United States Supreme Court. However, each of these cases is inapposite as none holds that the sentence of a juvenile homicide offender to a discretionary sentence of life without parole constitutes cruel and unusual punishment.

{¶76} First, in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), the United States Supreme Court held that a *mandatory* life-without-parole sentence for juvenile homicide offenders is cruel and unusual punishment. *Id.* at 2469.

{¶77} However, *Miller* is distinguishable because appellant's sentence of life without parole was *discretionary*, not mandatory. *State v. Long*, ____ Ohio St.3d ____, 2014-Ohio-849 ("*Long II*"), ¶5. The trial court had the discretion to impose either life without parole or life with parole eligibility after serving a definite period of 20, 25, or 30 years. *Id.*; R.C. 2929.03(A)(1). Thus, "Ohio's sentencing scheme does not [run] afoul of *Miller*, because the sentence of life without parole is discretionary." *Long II* at ¶19.

{¶78} Next, in *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court held that the imposition of the death penalty on juvenile offenders is cruel and unusual punishment. *Id.* at 575. However, *Roper* is distinguishable because appellant was not sentenced to death.

{¶79} Finally, in *Graham v. Florida*, 560 U.S. 48 (2010), the United States Supreme Court held that the imposition of a life-without-parole sentence on a juvenile offender *who did not commit homicide* is cruel and unusual punishment. *Id.* at 82.

*Graham* is distinguishable since appellant was convicted of three counts of aggravated murder.

**{¶80}** While none of these cases applies to appellant's sentence, he essentially argues this court should extend their holdings to invalidate his life-without-parole sentence. However, appellant does not reference any pertinent authority supporting such extension. To the contrary, the Supreme Court in *Miller*, *supra*, stated that a sentencing court is *not* precluded from imposing a life-without-parole sentence on a juvenile homicide offender. *Id*. at 2469; *accord Long II* at ¶14.

**{¶81}** It is worth noting that in *Graham*, *supra*, the United States Supreme Court stated that 44 states, the District of Columbia, and the federal government permit sentences of life without parole for juvenile homicide offenders. *Id*. at 2034-2036.

**The United States Supreme Court's Decision in *Miller v. Alabama***

**{¶82}** Pursuant to *Miller*, *supra*, a sentencing court must consider mitigating circumstances, including the juvenile's youth and its attendant circumstances, before a juvenile homicide offender can be sentenced to life without parole. *Id*. at 2475. The Supreme Court in *Miller* held that a *mandatory* sentence of life without parole imposed on a juvenile is cruel and unusual punishment because such sentence:

**{¶83}** precludes consideration of his chronological age and its hallmark features--among them, [1] immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account [2] the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects [3] the circumstances of the homicide

offense, including [4] the extent of his participation in the conduct and the way familial and peer pressures may have affected him. *Id.* at 2468.

{¶84} The United States Supreme Court decided *Miller* in 2012, one year before appellant's sentencing, which occurred in March 2013.

{¶85} In *Long II*, decided in 2014, the Supreme Court of Ohio expressly followed *Miller* in holding that a trial court, in sentencing a juvenile offender for aggravated murder, must *consider* his youth as a mitigating factor before imposing a sentence of life without parole. *Id.* at paragraph one of the syllabus. Further, the Ohio Supreme Court in *Long II* held that *the record* must reflect that the court specifically considered the juvenile offender's youth as a mitigating factor at sentencing when imposing a prison term of life without parole. *Id.* at paragraph two of the syllabus.

{¶86} The Court in *Long II* stated that, "[a]lthough *Miller* does not require that specific findings be made on the record, it does mandate that a trial court *consider as mitigating* the offender's youth and attendant characteristics before imposing a sentence of life without parole." (Emphasis sic.) *Id.* at ¶27. The Court held that the offender's youth at the time of the offense must be "weighed against any statutory consideration that might make an offense more serious or an offender more likely to recidivate." *Id.* at ¶19. The Court stated that, because a life-without-parole sentence implies that rehabilitation is impossible, when the court imposes such sentence, its reasons for this sentence should be on the record. *Id.*

{¶87} Although appellant explicitly waived the right to present information in mitigation of punishment, appellant's trial counsel fully informed the court that it was

25

required to consider appellant's age as a mitigating factor.  He quoted a pleading recently filed in the United States Supreme Court, as follows:

{¶88} Jurisprudence has been toward more not less protection for juvenile offenders.

{¶89} This trend began in *Thompson v. Oklahoma* in which William Thompson challenged a death sentence pronounced for his first degree murder conviction which stemmed from his active participation in a brutal murder at the age of 15.

{¶90} The Supreme Court of the United States held that regardless of the underlying crime, the death penalty violated the Eighth Amendment's prohibition of cruel and unusual punishment when applied against the offender under the age of 16.

{¶91} Two decades later, relying on similar rationales concerning the developmental differences between children and adults, the Court expanded that prohibition of death sentences for children to include all juveniles under the age of 18, and that was *Roper v. Simmons*. Following *Roper*, the Supreme Court of the United States * * * held constitutionally impermissible sentences of life without the possibility of parole for juvenile offenders convicted of crime other than homicide, and that was in the *Graham* case.

{¶92} Then the *Miller* case came before the Supreme Court of the United States only two years later.

**{¶93}** The Court extended *Graham* to bar mandatory life sentences without parole for juveniles who commit homicide.

**{¶94}** Now, in doing so, the high court recognized and adhered to *Graham* and perhaps *Roper*'s rationale and foundational principle that the imposition of a state's most severe penalty on a juvenile offender cannot proceed as though they were not children.

**{¶95}** Appellant's trial counsel then stated as follows:

**{¶96}** Respectfully, today, I move your Honor to fashion a sentence that reflects the reality of [appellant's] mental and psychiatric states. I ask this of your Honor even in the face of almost certain disdain for [appellant] because the law deems important that he was a juvenile at the time.

**{¶97}** The prosecutor took no exception with the foregoing as being a functionally adequate recitation for purposes of sentencing appellant. And unlike *Long*, the prosecutor did not argue that appellant's youth justified a maximum sentence.

**{¶98}** It was against this backdrop that the trial court considered all *Miller* factors and afforded each one proper weight based on the particular facts of this case. That some of the *Miller* factors did not favor appellant at sentencing does not mean that the trial court failed to consider appellant's youth as mitigating.

**{¶99}** Accordingly, despite the lack of an explicit statement from the trial court that it considered this juvenile offender's youth as mitigating, the record reflects that it did so. The trial court simply found that, even considering the mitigating factors set forth

in *Miller*, life without the possibility of parole was warranted. That conclusion is a function of the facts, not a breakdown in the process.

{¶100} Thus, the trial court's sentence complied with *Miller.* Further, while the Ohio Supreme Court had not yet decided *Long II* when appellant was sentenced, because the Court in *Long II* explicitly followed *Miller*, by considering the *Miller* factors in fashioning appellant's sentence, the trial court also complied with *Long II.* The trial court's consideration of the *Miller* factors is summarized as follows:

{¶101} First, the trial court considered appellant's age and level of maturity. The court noted he was 17 and one-half years old at the time of his crimes. He was an intelligent student planning to graduate early and to attend college. He considered himself to be mature for his age. He suffered no mental or cognitive impairment. He was not insane, incompetent, or impaired at any relevant time. The court noted that, while there were and are no mental impairment issues, appellant feigned symptoms of mental illness when interacting with Dr. Resnick and the jail staff. The court noted that appellant knew what he did was wrong. This is why he hid his weapons in his book bag; fled from the school after the shooting; and acknowledged his wrongdoing soon after he was apprehended.

{¶102} Second, the trial court considered appellant's home and family environment. The court noted that he had a tumultuous upbringing, both as an infant and as an adolescent. His parents lost custody of him when he was three years old because they did not properly care for him. However, since that time, appellant's maternal grandparents have provided a home for him; have raised him; and have been loving and caring guardians. The court noted that appellant sought to better himself by

28

holding various jobs and transferring to Lake Academy, which allowed him to work while going to school.

{¶103} Third, the trial court stated that "[m]any juvenile offenders are manipulated or pressured into committing crime by adults or peers who urge or incite the juvenile to commit crimes. They prey upon the vulnerability of an impressionable youth. * * * That didn't occur here. These crimes were all Defendant's, and [he] was not an impressionable youth. * * * He did this on his own." The court noted that appellant planned, prepared for, and executed this scheme by himself. He was not manipulated or pressured by anyone into committing these crimes. He confided in no one and he had no accomplice. The court explicitly stated that it considered each of the foregoing factors in imposing sentence.

{¶104} Fourth, the court considered the circumstances of appellant's offenses and the extent of his participation in them. The court noted that appellant planned his attack long before the shootings and methodically carried out that plan. He stole a handgun, two magazines, and bullets from his uncle the day before the shootings. The night before, he loaded both magazines and put one in the gun. The morning before, he put the gun, the spare magazine, and a knife in his book bag, and hid them there until he took them out in the cafeteria. He intentionally dressed the part by wearing a shirt with the word "Killer" labeled across the chest. Further, appellant was relentless in his shooting. He ambushed eight unsuspecting students who were talking with each other and did nothing to provoke him. He shot six students in the cafeteria resulting in the death of three of them. While students and faculty were running out of the cafeteria and down the hallway, appellant aimed his gun at an adult monitor who was running

29

after him to prevent him from chasing him. While in the hallway, appellant ran up to Nick Walczak, who appellant had shot in the cafeteria, and shot him again from behind. Appellant emptied the magazine in the gun of all ten of its shells. Further, the court noted that the nature of the injuries and their impact on the victims and their families were particularly unusual and intense. All six victims were juveniles who had lives filled with potential. Those who were killed have been deprived of their lives. The survivors and their families have suffered devastating physical pain and psychological injury, and they face a future that is forever tainted by appellant's conduct. Nick is paralyzed and confined to a wheelchair, severely challenged physically and psychologically, with a serious economic impact on his family.

**{¶105}** In addition, the court noted that appellant never stated his motive for this merciless rampage. The court noted that, while being interrogated, appellant said he did not know why he shot people. He said it was just something he chose to do. The court stated that, while appellant's motive was unclear, it appeared he wanted to make a name for himself and to make front page news. Thus, it was no coincidence that on the day of the shootings, appellant boldly and brazenly wore a shirt that displayed across his chest the word "Killer." The court stated that because appellant attacked without discernible motive or provocation, appellant is "extremely dangerous."

**{¶106}** Further, the court noted that appellant has shown no remorse, making him more likely to re-offend. In his interview with the detectives, appellant said that after he fired the first few rounds, he regretted it and felt terrible. However, the court noted that he repeatedly shot his gun at students in the cafeteria and in the hall until all rounds in

30

the clip were fired. Further, when he was informed at the Safety Center during his interview that one of his victims had died, he showed no remorse.

{¶107} We also note that appellant's conduct at sentencing showed a complete lack of remorse.

{¶108} This case is distinguishable from *Long II*. In that case, the trial court did not even mention at sentencing that Long was a juvenile when he committed his offenses. As a result, the Ohio Supreme Court stated it could not be sure how the trial court applied this factor. *Id.* at ¶27. Further, in *Long II*, the trial court had conducted a group sentencing of Long and his two adult accomplices at the same time. As a result, the Supreme Court in *Long II* stated that Long might not have been given the benefit of the consideration of youth as a mitigating factor. *Id.* at ¶28. In contrast, here, the trial court explicitly considered the mitigating factors of appellant's youth on the record. Further, in weighing appellant's youth against other pertinent factors, including the nature of the crimes and appellant's participation in them, the court found these factors outweighed the mitigating factors of appellant's youth.

{¶109} In summary, the trial court was not bound by a mandatory sentencing scheme, and considered the factors outlined in *Miller* in imposing sentence. Moreover, by complying with *Miller*, the trial court also complied with *Long II.* Further, we cannot say appellant's sentence of life in prison without parole is so disproportionate to the crimes he committed as to shock the community's sense of justice. Although appellant's sentence is severe, it is not disproportionately so. He shot six students in school, three of whom were killed and another paralyzed, without provocation and in cold blood. The horrific and senseless nature of this homicide is compounded by the

31

fact that, at sentencing, appellant showed no remorse and even contempt for his victims and their families. In addition, appellant's sentence was within the statutory range for each count of which he was convicted. We therefore hold that appellant's sentence did not amount to cruel and unusual punishment.

{¶110} Appellant's first and second assignments of error are overruled.

{¶111} For his third assignment of error, appellant alleges:

{¶112} "THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS TO SUCH."

**Ineffective Assistance of Trial Counsel**

{¶113} Appellant argues that if this court holds the issues raised in his first two assignments of error, i.e., his mandatory bindover and his life-without-parole sentence, were not preserved for appeal, then his trial counsel was ineffective in not doing so.

{¶114} In order to support a claim of ineffective assistance of counsel, the defendant must satisfy a two-prong test. First, he must show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, the defendant must show the deficient performance prejudiced the defense. *Id*. In order to satisfy this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's * * * errors, the result of the [trial] would have been different." *Id*. at 694. In the context of a guilty plea, the defendant must demonstrate that there is a reasonable probability that, but for his counsel's errors, he would not have pled guilty and instead would have insisted on going to trial. *State v. Curd*, 11th Dist. Lake No. 2003-L-030, 2004-Ohio-7222, ¶110.

{¶115} With respect to appellant's argument that his attorney failed to object and thus failed to preserve his challenge to his mandatory bindover, since we hold that appellant did not waive this challenge, he was not prejudiced by his attorney's failure to object.

{¶116} Next, with respect to appellant's argument that his attorney failed to preserve his constitutional challenge to his life-without-parole sentence by not presenting any constitutional argument in support of his objection, we note that in addition to trial counsel's objection to appellant's sentence, counsel also cited *Miller*, *Graham*, and *Roper*. Further, the state concedes on appeal that appellant's trial counsel specifically objected to appellant's sentence and preserved this issue for appeal. Because appellant's trial counsel raised this issue in the trial court, the issue was preserved and counsel's performance was not deficient.

{¶117} We therefore hold that appellant did not receive ineffective assistance of trial counsel.

{¶118} Appellant's third assignment of error is overruled.

{¶119} For his fourth and final assigned error, appellant contends:

{¶120} "THE TRIAL COURT'S IMPOSITION OF CONSECUTIVE SENTENCES UPON THE APPELLANT IS NOT SUPPORTED BY THE TRIAL COURT'S FINDINGS."

**Appellant's Consecutive Sentences**

{¶121} Because appellant argues his consecutive sentences were not supported by the trial court's findings, we review his sentence pursuant to R.C. 2953.08(G)(2)(a). That section provides that the appellate court may vacate the sentence and remand the matter to the sentencing court for resentencing if the appellate court clearly and

33

convincingly finds that the record does not support the sentencing court's findings under R.C. 2929.14(C).

{¶122} The Eighth District recently stated in *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891:

{¶123} It is * * * important to understand that the clear and convincing standard used by R.C. 2953.08(G)(2) is written in the negative. It does not say that the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings. In other words, the restriction is on the appellate court, not the trial judge. This is an extremely deferential standard of review. *Venes*, *supra*, at ¶ 21.

{¶124} Pursuant to R.C. 2929.14(C)(4), consecutive sentences can be imposed if the court finds that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender and that (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. In addition to these two factors, the court must find, as pertinent here, that at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses was so great or unusual that no one prison term for any of the offenses adequately reflects the seriousness of the offender's conduct. R.C. 2929.14(C)(4)(b).

{¶125} Subsequent to this amendment in the consecutive sentencing law, Ohio Appellate Districts have held that R.C. 2929.14(C)(4) requires trial courts to make the

34

foregoing findings when imposing consecutive sentences. *State v. Koeser,* 11th Dist. Portage No. 2013-P-0041, 2013-Ohio-5838, ¶21.

**{¶126}** However, while the requirement that fact-finding occur was re-enacted by H.B. 86, the requirement that a sentencing court give reasons for imposing consecutive sentences, which existed under former R.C. 2929.19(B)(2), was not re-enacted. *Koeser*, *supra*, at ¶22. Thus, a sentencing court is not statutorily required to give reasons for its findings. *Id.*

**{¶127}** Turning now to the instant case, the trial court complied with R.C. 2929.14(C)(4) in finding that: (1) consecutive sentences are necessary to protect the public from future crime and to punish appellant; (2) consecutive sentences are not disproportionate to the seriousness of his conduct and to the danger he poses to the public; and (3) appellant committed two or more of these offenses as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no one prison term for any of the offenses adequately reflects the seriousness of his conduct.

**{¶128}** Further, we note the court's findings were supported by the record. In addition, while the court was not required to provide reasons in support of its findings, the trial court did so and the court's reasons were also supported by the record.

**{¶129}** In fact, appellant does not dispute that the trial court made the findings required by R.C. 2929.14(C). Nor does he deny that these findings were supported by the record. Instead, he argues that this case is no more serious than many other aggravated murder cases in which consecutive sentences are not imposed, making consecutive sentences inappropriate here. Thus, his argument challenges only the trial

court's imposition of consecutive sentences for his aggravated murder offenses, not the remaining crimes. Further, nothing in R.C. 2953.08(G)(2) suggests that a different appellate standard of review, let alone the standard suggested by appellant, applies in the case of multiple counts of aggravated murder.

{¶130} In any event, we cannot agree with appellant's argument that this case is not sufficiently serious to warrant consecutive sentences. Appellant did not act on impulse, on provocation, or under pressure from peers or adults. To the contrary, he planned this attack weeks in advance before he went to school that day with a loaded gun. He shot three young students to death. He shot another student several times, confining him to a wheelchair and subjecting him to a life of pain and disability. Appellant also brought indescribable pain, grief, and lifelong tragedy to the victims' families.

{¶131} Applying the appellate standard of review in R.C. 2953.08(G)(2), we do not clearly and convincingly find that the record does not support the trial court's findings under R.C. 2929.14(C).

{¶132} Appellant's fourth assignment of error is overruled.

{¶133} For the reasons stated in the opinion of this court, appellant's assignments of error lack merit and are overruled. It is the judgment and order of this court that the judgment of the Geauga County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.