[Cite as *State v. LaRosa*, 2020-Ohio-160.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**TRUMBULL COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-T-0097** |
| JACOB R. LaROSA, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas.
Case No. 2015 CR 00942.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor; *Christopher Becker* and *Ashleigh Musick*, Assistant Prosecutors, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Lynn Maro*, Maro & Schoenike, Co., 7081 West Boulevard, Suite 4, Youngstown, OH 44512 (For Defendant-Appellant).

TIMOTHY P. CANNON, P.J.

{¶1} Appellant, Jacob R. LaRosa ("LaRosa"), appeals a judgment in the Trumbull County Court of Common Pleas, General Division, sentencing him to a prison term of life without parole, to be served consecutively with three other prison terms. We affirm the trial court's judgment.

{¶2} The following facts and procedure are supported by the record in this matter:

{¶3} On the morning of March 31, 2015, 15-year-old LaRosa was released from the Juvenile Justice Center ("JJC") after serving time in detention for a probation violation. According to his own account, he met with friends and began drinking excessively. Shortly after 5:00 p.m., LaRosa entered the house of the victim, 94-year-old Marie Belcastro, at 509 Cherry Street in Niles, Ohio. Mrs. Belcastro's house was directly across from LaRosa's house and was separated by an alleyway. LaRosa was later identified by video surveillance, which was provided by a neighbor, walking from the direction of the victim's house with a bottle of alcohol and proceeding down the alleyway around the time of the alleged crimes. The neighbor who provided video surveillance to investigators also found an empty whiskey bottle in his yard that he believed was removed from Mrs. Belcastro's home.

{¶4} Thereafter, LaRosa arrived home in a nearly incoherent state with blood on his shirt, shoes, and glasses. He made claims to multiple family members that he was attacked by other juveniles who forced him to consume alcohol and other substances at gunpoint. LaRosa's mother called for help. Niles Police Officer Mobley and EMT personnel arrived at the residence to attend to LaRosa's injuries resulting from the alleged assault.

{¶5} As LaRosa was being loaded into the ambulance, Officer Mobley was alerted to a commotion at 509 Cherry Street, adjacent to LaRosa's home. One of Mrs. Belcastro's daughters waved down the paramedics at the LaRosa residence in a panic after discovering that the Belcastro residence had been broken into through the side door. Inside the home, a blood trail was found throughout the house from the living room through the hallway. A large secretary desk was also toppled over and blocking the front

2

door from the inside. Mrs. Belcastro's deceased body was discovered by Officer Mobley and her daughter on the floor in the first bedroom of her home, naked from the waist down and twisted awkwardly into a fetal position. She was severely beaten, and her undergarments were found in the living room. Outside the house, police discovered liquor bottles, including one liquor bottle that had blood on it.

{¶6} LaRosa was taken to St. Joseph Hospital, where his blood alcohol level was determined to be nearly three times the legal limit for an adult. He had no discernable injuries to explain the blood on his body. Blood was also found by the attending nurse on LaRosa's underwear and his penis. LaRosa's underwear was seized by investigators. LaRosa was interviewed by a detective. His statements were erratic and, at times, incoherent due to his intoxication. LaRosa was not read his *Miranda* rights prior to this interview.

{¶7} LaRosa was charged in a complaint of delinquency on April 9, 2015, with four counts alleging crimes involving LaRosa breaking into the home of Mrs. Belcastro, beating her to death, and attempting to rape her. The case was filed in the Trumbull County Court of Common Pleas, Juvenile Division, as Case No. 2015-JD-177.

**Juvenile Division Proceedings**

{¶8} On the same day the complaint of delinquency was filed, the state of Ohio filed a motion to transfer the case from the juvenile division to the Trumbull County Court of Common Pleas General Division, seeking to charge LaRosa as an adult. Thereafter, he waived a probable cause hearing, and the matter was set for an amenability hearing to determine whether LaRosa, who was 15 years old at the time of the alleged crimes,

3

should be transferred to the general division and tried as an adult. The amenability hearing was conducted over the course of four days, beginning on November 16, 2015.

{¶9} At the hearing, the juvenile division heard testimony from, inter alia, the coroner that conducted the autopsy of Mrs. Belcastro, various doctors who had evaluated LaRosa and his medical history, detectives and law enforcement officers who investigated the homicide of Mrs. Belcastro, juveniles who had interactions with LaRosa at JJC before and after the homicide, and members of LaRosa's family.

{¶10} LaRosa's psychological and behavioral history were presented in great detail at the amenability hearing. Three experts presented testimony and reports on his history of treatment, which had been mostly unsuccessful. LaRosa had been in treatment—either out-patient or within a structured facility—starting at approximately 8 years of age. He had been prescribed various medications for issues such as bipolar disorder, ADHD, defiance disorders, and mood disorders.

{¶11} After closing arguments, the juvenile division issued an order granting the state's motion to transfer the case to the general division for criminal prosecution as an adult. In the order, the court individually addressed each of the statutory factors—R.C. 2152.12(D) in favor of transfer, and R.C. 2152.12(E) weighing against transfer—before concluding as follows:

> Based on the totality of the facts, relevant testimony, evidence, and after due consideration to both sets of factors contained in ORC Section 2152 and given [sic] appropriate weight to all evidence presented and appropriate, as well as serious concerns for the safety of the community given the history of fear his family lived under which extended to the neighbors and community and the brutality and violence of the alleged offense, THE COURT FINDS that the factors for transfer greatly outweigh the factors against transfer. There are reasonable grounds to believe that the Juvenile is not amenable to care or rehabilitation in a facility designed for the care[,] supervision,

4

and rehabilitation of delinquent children, and that the safety of the community requires that Jacob LaRosa be subject to adult sanctions.

**General Division Proceedings**

{¶12} Following the transfer, LaRosa was indicted by the Trumbull County Grand Jury on December 16, 2015, and charged with four counts: Aggravated Murder (F1) in violation of R.C. 2903.01(B); Aggravated Burglary (F1) in violation of R.C. 2911.11(A)(1) and/or (2); Aggravated Robbery (F1) in violation of R.C. 2911.01(A)(1) and/or (3); and Attempted Rape (F2) in violation R.C. 2923.02(A)&(E)(1) and 2907.02(A)(2)&(B).

{¶13} On December 14, 2016, LaRosa filed a motion for determination of competency to stand trial, which was voluntarily withdrawn on August 4, 2017. On June 23, 2017, LaRosa filed a motion for a bifurcated trial, which was denied on July 31, 2017, and again before trial on February 12, 2018. Neither of these issues are subject to the present appeal.

**Suppression Motion**

{¶14} On March 8, 2017, LaRosa filed a motion to suppress various evidence obtained during the investigation of the homicide. The evidence sought to be suppressed that is at issue in the present appeal is as follows:

> A.    Fingernail scrapings from LaRosa taken at the hospital.
>
> B.    LaRosa's socks, underwear, and a washcloth used to wipe his groin at the hospital.

The motion also sought to suppress statements obtained from LaRosa, as well as the fruits of any unlawful arrest, search, seizure, and interrogation.

{¶15} A hearing on the motion to suppress was held on December 28, 2017, and on February 1, 2018, the trial court issued its judgment with findings of fact and

5

conclusions of law overruling the motion. The court found that there was no expectation of privacy in LaRosa's hospital room or in the items removed from LaRosa by hospital staff after he voluntarily presented there purporting to be the victim of an assault. Further, the court found that the warrant authorizing a "hand swab" of LaRosa was sufficient in its description to authorize fingernail scrapings, because "[t]he description of a hand swab is such that an officer can without reasonable effort identify the place intended to be swabbed- i.e. the hand. Fingernails are located on the hand."

{¶16} Further, the trial court denied suppression of the statements made by LaRosa in the hospital room because he was not subject to custodial interrogation and, therefore, did not need to be advised of his *Miranda* rights. The court held that any "volunteered unforeseeable incriminating statement unforeseen to police" made by LaRosa to police and hospital staff alike was not subject to suppression.

**Trial and Sentencing**

{¶17} Voir dire commenced for trial in the matter on February 12, 2018. After one day of voir dire, LaRosa entered a no contest plea to all charges on February 13, 2018. The trial court advised LaRosa of the potential penalties for each charge, including the Tier III sex offender registration requirement, and found him guilty of all charges. LaRosa was also referred by the court to the Adult Supervision Department for a presentence evaluation, and the court set the matter for a mitigation hearing on April 5and April 6, 2018.

{¶18} At the mitigation hearing, many of the same witnesses called in the juvenile amenability proceeding testified: the coroner for Trumbull County, doctors familiar with both LaRosa and institutional resources, one of the detectives who investigated the

6

homicide, juveniles who discussed the homicide with LaRosa at JJC, and members of LaRosa's family.

{¶19} Dr. Humphrey Germaniuk, the coroner and medical examiner for Trumbull County, performed Mrs. Belcastro's autopsy. Dr. Germaniuk testified that Mrs. Belcastro was approximately four feet, seven to eight inches tall and weighed approximately 80-85 pounds at the time of her death. He stated that she was beaten so severely, he could not even opine as to how many times she was struck in the head by her assailant. He further testified that her eyes had been ruptured inside of her head due to the beating, and the bones in her face and the top of her skull had been crushed rather than merely broken. A fragmented hearing aid was still compacted into one of her ear canals, and portions of brain matter were visible through the crushed skull portions in the autopsy photographs. Dr. Germaniuk determined the manner of Mrs. Belcastro's death was homicide, and the cause of death was blunt craniocerebral trauma.

{¶20} A detective with the Niles Police Department testified as to the scene of the homicide at the Belcastro residence. On the outside, a side door to Mrs. Belcastro's home was broken into, which was photographed and submitted as evidence. Inside the home, the detective described three different places where the crimes listed in the complaint had been committed. In the living room, there was a massive amount of blood on the couch, floor, and sprayed on the walls and lamp. A flashlight—believed to be used in the attack— was visible in photographs of the living room, as well as Mrs. Belcastro's sweatpants and undergarments on the living room floor. In the hallway between the living room and bedroom, a second location contained a massive amount of blood, as well as blood splatter on the floorboard and wall. In addition, the detective confirmed the coroner's

7

testimony that brain matter was visible on the floor and sprayed across the wall, as well as a broken hearing aid and a piece of Mrs. Belcastro's skull. In the first bedroom outside the hallway, a third location contained a massive amount of blood on a bed, as well as the victim deceased on the floor. She was naked from the waist down, twisted into a fetal position on the floor, and the entire front of her head and face was crushed, as the coroner's testimony and photographs confirmed.

{¶21} At the conclusion of the mitigation hearing, LaRosa was permitted to address the trial court. Also, each of the victim's two daughters were given the chance to address the court. Each indicated how the particularly brutal circumstances of their mother's murder has impacted them, their families, and the community. One of the daughters specifically asked the trial court to impose the maximum sentence. The state recommended the maximum sentence of life without the possibility of parole, as well as for all sentences to be served consecutively.

{¶22} The trial court reviewed, among other things, a presentence report from the Department of Adult Probation, the extensive psychological assessments and medical information provided for LaRosa, victim impact statements, LaRosa's allocution statement, the transcript of the juvenile amenability hearing, and the *Miller* factors for sentencing juveniles. The presentence report ordered by the court contained an Ohio Risk Assessment System rating of "very high" with regard to LaRosa's risk of recidivism. The report also stated that LaRosa had not only struggled with expressing true remorse, but had repeatedly bragged about his crimes to other inmates while in JJC, despite having been advised by his counsel to show remorse.

8

{¶23} In considering all of the aforementioned, the trial court ordered the following sentence for each charge:

Aggravated Murder (F1)- Life in prison without parole;

Aggravated Burglary (F1)- 11 years;

Aggravated Robbery (F1)- 11 years;

Attempted Rape (F2)- 8 years.

{¶24} The trial court ordered the sentences to be served consecutively, stating—among other things—LaRosa showed a lack of remorse, the harm was so great and unusual that a single prison term does not adequately reflect the seriousness of the conduct, and consecutive terms are necessary to protect the public and punish him. LaRosa was also classified as a Tier III sex offender with the most stringent, lifetime reporting requirements.

{¶25} LaRosa filed a timely notice of appeal and raises seven assignments of error for our review. For clarity and convenience, we combine and consider the assignments out of order.

{¶26} LaRosa's first two assignments of error challenge the juvenile division's decision to transfer the matter to the general division. LaRosa's first assignment of error states:

> **Appellant's Assignment of Error No. 1:** The juvenile court abused its discretion and violated Jacob LaRosa's due process rights when it determined Jacob was not amenable to treatment in the juvenile system, in violation of R.C. §2152.12(b), the Fifth, Eighth and Fourteenth Amendment to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

{¶27} During an amenability determination, the juvenile division may transfer jurisdiction if it finds, inter alia, that the child is not amenable to rehabilitation within the

9

juvenile justice system and that, to ensure the safety of the community, the child should be subject to adult sanctions. R.C. 2152.12(B)(3). R.C. 2152.12(D) lists the factors in favor of transferring jurisdiction:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

To the contrary, R.C. 2152.12(E) lists the factors in favor of retaining jurisdiction:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

10

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

In addition to the factors specifically listed in the statute, the juvenile court is instructed to consider "any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C). "The record shall indicate the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3).

{¶28} "[T]he juvenile court enjoys wide latitude to retain or relinquish jurisdiction, and the ultimate decision lies within its sound discretion." *State v. Watson*, 47 Ohio St.3d 93, 95 (1989), citing *State v. Carmichael*, 35 Ohio St.2d 1 (1973), paragraphs one and two of the syllabus. A juvenile court's amenability determination under R.C. 2152.12 will not be reversed unless the court has abused its discretion. *See State v. Douglas*, 20 Ohio St.3d 34, 37 (1985); *see also Carmichael, supra.*

{¶29} In the matter sub judice, the juvenile court stated each factor contained in R.C. 2152.12(D) and (E) individually and engaged in an analysis regarding each factor.

11

Specifically, the court found that seven of the nine factors in R.C. 2152.12(D) weighed in favor of transfer, whereas none of the eight factors in R.C. 2152.12(E) weighed against transfer, and the court indicated greater weight was given to certain factors.

{¶30} LaRosa argues on appeal that multiple factors were determined incorrectly by the juvenile court and without support in the record. Specifically, LaRosa contends that factor 8 under R.C. 2152.12(D)—also contained in factor 6 under R.C. 2152.12(E)—relating to whether the juvenile is emotionally, physically, or psychologically mature enough for transfer, was decided incorrectly and unsupported by the record. Also, LaRosa argues that factor 7, regarding whether rehabilitation of the child can occur in the juvenile system, and factor 9, regarding whether there is sufficient time to rehabilitate the child within the juvenile system, were erroneously determined by the court. LaRosa does not assert in his briefing how his due process rights were violated by the juvenile court in conducting the amenability hearing.

{¶31} Multiple psychologists testified and opined that (1) they did not believe LaRosa was mature enough for transfer; (2) untried treatment options existed in the juvenile system; and (3) there was adequate time for rehabilitation in the juvenile system. This testimony alone, however, is not persuasive enough to render the trial court's decision an abuse of discretion. Each of the doctors acknowledged that their determinations were only with regard to individual factors for the court to consider and that the juvenile court had the ultimate responsibility to consider all of the statutory factors balanced together in making an amenability determination. The undisputed factors still overwhelmingly support transfer to the general division, and the juvenile court was within its discretion to assign more or less weight to those factors as applicable. Further, the

extensive history of unsuccessful or uncompleted treatments over nearly a decade of LaRosa's life, beginning in early childhood, support a finding that he will not be amenable to treatment in the juvenile system before he reaches the age of 21.

{¶32} The court conducting the amenability hearing is in the best position to assess the statutory factors after hearing the testimony and evidence. Because the record reflects that the court fulfilled its obligation under R.C. 2152.12(B)(3) in weighing the statutory factors, and because its determination is supported by competent and credible evidence in the record, we hold that the decision to transfer LaRosa to the general division was not an abuse of discretion, nor was it a violation of his right to due process.

{¶33} LaRosa's first assignment of error is without merit.

{¶34} LaRosa's second assignment of error states:

> **Appellant's Assignment of Error No. 2:** The decision to transfer the case to the general division was invalid because the amenability hearing was conducted in violation of due process when the trial court permitted introduction and consideration of improper evidence and improper arguments in violation of the rights and liberties secured by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, 16.

{¶35} LaRosa points to five instances of allegedly improper evidence or improper argument during the amenability hearing, which are addressed individually and in combination as follows:

> [A.] Improper arguments by the state throughout the amenability hearing regarding "lack of remorse" violated the presumption of innocence and interjected improper facts into the hearings.

{¶36} "A bindover proceeding has two components: a probable-cause determination and an amenability determination." *State v. Whitterson*, 1st Dist. Hamilton

13

No. C-110207, 2012-Ohio-2940, ¶19. Here, the hearing on probable cause was waived by LaRosa. Hence, the juvenile court found there was probable cause that LaRosa committed the charged offenses. Therefore, a presumption of innocence is not relevant during an amenability determination because the purpose of the amenability determination is establishing which forum will ultimately hear the case—the juvenile division or the general division. Once the proper forum is determined, the presumption of innocence applies.

{¶37} Further, the remorse of a juvenile offender is regularly discussed and presented to the court in aid of determining whether the offender is amenable to rehabilitation within the juvenile system. *See, e.g.*, *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶8; *State v. Moorer,* 11th Dist. Geauga Nos. 2001-G-2353 & 2001-G-2354, 2003-Ohio-5698, ¶45; *State v. D.H.*, 2d Dist. Montgomery No. 26383, 2015-Ohio-3259, ¶3; *State v. McDonald*, 2d Dist. Montgomery No. 11228, 1990 WL 78593, *5-6 (June 5, 1990) (expert testified that the offender "never expressed any feeling of remorse" over the victim's death, and the court stated that "[g]enerally, the greater the culpability of the offense, the less amenable will the juvenile be to rehabilitation"); *State v. Ferguson*, 2d Dist. Montgomery No. 27032, 2017-Ohio-7930, ¶45, ¶94; *State v. Anderson*, 5th Dist. Delaware No. 14 CAA 05 0034, 2015-Ohio-888, ¶18; *In re D.M.*, 6th Dist. Lucas Nos. L-16-1237, L-16-1238, & L-16-1270, 2017-Ohio-8768, ¶23; *State v. J.L.S.,* 10th Dist. Franklin No. 18AP-125, 2019-Ohio-4173, ¶72. Therefore, evidence pertaining to remorse of an offender is not improper for presentation to a juvenile court during an amenability determination.

[B.] Admission of Jacob LaRosa's statements made at the hospital for consideration of the statutory factors at the amenability hearing was improper as there was no valid waiver of rights.

[C.] The state improperly impeached its own witness during the amenability hearing under the guise of refreshing recollections.

[D.] The state offered facts not in evidence to discredit DYS and Dr. Stinson's testimony.

{¶38} "[B]ecause the bindover proceeding is not adjudicative (the juvenile's guilt or innocence is not at issue), statutory and constitutional questions concerning the admissibility of evidence are premature and need not be addressed." *State v. Whisenant*, 127 Ohio App.3d 75, 85 (11th Dist.1998). "Fundamental fairness and due process are not violated by the juvenile court's failure to rule on or to suppress evidence obtained in alleged violation of *Miranda* in this type of proceeding." *Id.*

{¶39} Further, we agree with our sister districts that a juvenile court conducting a dispositional hearing, including a bindover hearing following a probable cause determination, "may admit evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence." Juv.R. 34(B)(2). *See in re: B.W.*, 7th Dist. Mahoning No. 17 MA 0071, 2017-Ohio-9220, ¶46; *State v. Williams*, 9th Dist. Lorain No. 91CA005054, 1991 WL 231496, *2 (Nov. 6, 1991).

{¶40} It was not improper to allow the state to present the recorded audio made by police of LaRosa at the hospital in the context of the amenability hearing. The juvenile court was permitted to admit evidence that is material and relevant to LaRosa's amenability to transfer, including hearsay. Further, none of the evidence or statements referenced by LaRosa on appeal were cited in the trial court's analysis in support of or in opposition to transfer, and it does not appear from the juvenile court's entry that they were

15

weighed by the court in making its determination. Therefore, the court's admission of the statements and evidence in the above instances was not improper, and LaRosa was not prejudiced by the admissions.

> [E.] The juvenile court improperly admitted the testimony and report of Dr. Neuhaus and considered his testimony as an expert witness.

{¶41} As discussed, the juvenile court has broad discretion to admit evidence that is material and relevant during an amenability hearing. It is undisputed that the parties stipulated to Dr. Neuhaus as an expert. He was one of three medical experts presented to the court. To the extent his testimony offered an opinion not contained in his written report—in this case, agreeing with the assessment of another expert who offered testimony and a written report to the court—the juvenile court was permitted to receive and consider it, determining the appropriate weight to give it in making an amenability determination.

{¶42} For all of the foregoing reasons, the trial court did not violate LaRosa's due process rights when conducting the amenability hearing. His second assignment of error is without merit.

{¶43} LaRosa's fourth and fifth assignments of error challenge the decision to deny his motion to suppress evidence. LaRosa's fourth assignment of error states:

> **Appellant's Assignment of Error No. 4:** The trial court erred in failing to [sic] items seized by the police on March 31, 2015 from appellant, the hospital room of appellant as the seizures were in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Ohio Const., art. I, §14.

{¶44} LaRosa argues the trial court erred by not prohibiting the state from using the items seized by police from the hospital room on March 31, 2015, following the filing and hearing on the motion to suppress the items and evidence.

16

{¶45} "An appellate court's review of the grant or denial of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. "During a hearing on a motion to suppress evidence, the trial judge acts as the trier of fact and, as such, is in the best position to resolve factual questions and assess the credibility of witnesses." *State v. Lett*, 11th Dist. Trumbull No. 2008-T-0116, 2009-Ohio-2796, ¶13, citing *Burnside, supra*, at ¶8. "An appellate court reviewing a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence." *Id.* "Once the trial court's factual determinations are accepted, the appellate court then conducts a de novo review of the trial court's application of the law to those facts." *Wickliffe v. Dust*, 11th Dist. Lake No. 2005-L-129, 2006-Ohio-2017, ¶8, citing *State v. Dohner*, 11th Dist. No. 2003-P-0059, 2004-Ohio-7242, ¶10.

{¶46} "'While the Fourth Amendment of the U.S. Constitution does not explicitly state that the violation of its provisions against unlawful search and seizure will result in suppression of the evidence obtained as a result of the violation, the U.S. Supreme Court held that the exclusion of evidence is an essential part of the Fourth Amendment.'" *State v. Eggleston*, 11th Dist. Trumbull No. 2014-T-0068, 2015-Ohio-958, ¶17, quoting *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶29, citing *Weeks v. United States*, 232 U.S. 383, 394 (1914) (overruled) and *Mapp v. Ohio*, 367 U.S. 643, 649 (1961). "'The primary purpose of the exclusionary rule is to remove incentive from the police to violate the Fourth Amendment.'" *Id.*, quoting *Casey, supra*, at ¶29.

{¶47} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects,

17

against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The language of Article I, Section 14 of the Ohio Constitution is nearly identical, and it has been interpreted by the Ohio Supreme Court as affording the same protection as the Fourth Amendment." *State v. Mullen*, 11th Dist. Ashtabula No. 2018-A-0018, 2018-Ohio-5188, ¶17, citing *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, ¶11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239 (1997).

**{¶48}** Under the Fourth Amendment, searches and seizures conducted without a warrant based on probable cause are unreasonable unless the search falls within an exception to this requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶18, citing *Athens v. Wolf*, 38 Ohio St.2d 237, 241 (1974).

A.   <u>Improper seizure of Jacob's socks, washcloth, and underwear.</u>

**{¶49}** The state argues that LaRosa's socks, underwear, and the washcloth used by hospital staff to clean blood from his groin were not unlawfully seized because the seizure was done by a private person—a nurse at the hospital—rather than police officers. We agree.

**{¶50}** The trial court's finding of facts, to which we defer in a review of the suppression hearing, state in pertinent part:

> Officer Biddlestone who at that time was employed by the Niles Police Department was sent to St. Joseph's Hospital to secure

Defendant, who was the suspect in the homicide of Marie Belcastro. Officer Biddlestone was instructed to secure Defendant and he was handcuffed as a suspect. Defendant's underwear and socks were already taken off so that hospital staff could treat Defendant. * * * Furthermore, when Defendant went to use the bathroom, the nurse who was there to administer aid to Defendant, advised Biddlestone that there was blood on his groin. The nurse wiped Defendant's groin clean with hospital property and there was blood on the rag. Officer Biddlestone retrieved this wash rag, his underwear, and socks from hospital staff.

{¶51} "[I]f a person has no reasonable expectation of privacy in the property searched, then the Fourth Amendment protections do not apply. *Burneson v. Ohio State Racing Comm.*, 10th Dist. Franklin No. 03AP-925, 2004-Ohio-3313, ¶30, citing *State v. Lane*, 4th Dist. Athens No. 97CA47, 1998 WL 159929, *3 (Mar. 11, 1998), citing *Katz, supra.* "Furthermore, the Fourth Amendment only provides protection against government action." *Id.* at ¶31, citing *State v. Henry*, 1 Ohio App.3d 126, 127 (1981). "Thus, a seizure by a private person is not prohibited by the Fourth Amendment." *Id.*, citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971); *Irvine v. California*, 347 U.S. 128 (1954); *Burdeau v. McDowell*, 256 U.S. 465 (1921); and *State v. McDaniel*, 44 Ohio App.2d 163 (1975).

{¶52} In *State v. Drain*, the Tenth Appellate District analyzed the issue of seizures of clothing from a suspect reporting to a hospital as a victim, and stated as follows:

It remains a question of first impression in Ohio whether an expectation of privacy persists in clothing or personal effects cut away from a purported robbery victim in a hospital emergency room to which he has voluntarily presented himself. Four other states, however, have addressed the issue, and have concluded that Fourth Amendment protection does not apply thereto. In *People v. Sutherland* (1980), 92 Ill.App.3d 338, the court found that "there is nothing in the record showing that defendant asked or even indicated that when his clothing was removed at the hospital it was not to be given to anyone else, or that he otherwise demonstrated an actual intent to preserve the privacy of his apparel." *Id.* at 342.

19

In *Floyd v. State* (1975), 24 Md.App. 363, the court concluded on similar facts that "the bloody clothing was evidence of the shooting. Inasmuch as it was evidence of a crime, the police had a right to seize it lest it be removed from the hospital emergency room and destroyed." *Id.* at 365. The *Floyd* court, rather than reaching its conclusion based on expectations of privacy, simply based its decision on exigent circumstances due to the imminent danger that the clothing would be destroyed or otherwise placed beyond the reach of police.

In *State v. Rogers* (Mo.App.1979), 585 S.W.2d 498, the court concluded without supplementary reasoning that the police seizure of clothing from a purported crime victim in an emergency room is reasonable under the circumstances, citing *United States v. Chadwick* (1977), 433 U.S. 1.

The case involving the most detailed reasoning, however, is that of *Craft v. Commonwealth* (Va.1980) 269 S.E.2d 797. The Virginia Supreme Court in *Craft* followed a rationale based upon the contention that when a purported victim is admitted to a hospital emergency room, and consents to the removal of his clothing incident to medical treatment, there can remain little expectation of privacy against seizure of the removed clothing. The court went even further, and concluded that a bullet removed from a defendant's body during treatment by the attending surgeon could properly be turned over to the police by the doctor without any expectation of privacy on the part of the patient. "The defendant had no property right in the bullet. No search by the officers was required or effected. It was not necessary because the clothing and bullet were not hidden or concealed. The articles lawfully came into the possession of [the doctor] and, under the circumstances of this case, there was no reason why they should not have been delivered to and received by the officers." *Id.* at 800.

*State v. Drain*, 10th Dist. Franklin No. 95APA03-351, 1995 WL 765169, *4-5 (Dec.29, 1995).

{¶53} Applying the law to the trial court's findings of fact, the seizure of LaRosa's clothing was done by a nurse attempting to treat him for alleged injuries. Because there was no government action, the protections of the Fourth Amendment are not invoked.

20

Likewise, the washcloth with the blood wiped from LaRosa's groin was not LaRosa's property. Therefore, he had no reasonable expectation of privacy in hospital property.

B.    Fingernail scrapings outside the warrant authorization.

{¶54} LaRosa argues that the scrapings taken from his fingernails while at the hospital exceeded the authorization of the search warrant. We disagree.

{¶55} The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized*." (Emphasis sic.) "'The manifest purpose of this particularity requirement was to prevent general searches. * * * [T]he requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" *State v. Bangera*, 11th Dist. Geauga No. 2015-G-0021, 2016-Ohio-4596, ¶31, quoting *Maryland v. Garrison*, 480 U.S. 79 (1987). "By requiring a particular description of the items to be seized, the Fourth Amendment 'prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *Id.*, quoting *Marron v. United States*, 275 U.S. 192, 196 (1927).

{¶56} "The standard for determining the sufficiency of the description" for a search warrant "is that '"the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended."'" *State v. Dalpiaz*, 11th Dist. Portage No. 2001-P-0044, 2002-Ohio-7346, ¶17, quoting *State v. Pruitt*, 97 Ohio App.3d 258, 261 (11th Dist.1994), quoting *Steele v. United States*, 267 U.S. 498, 503 (1925).

21

{¶57} The dispute in the present matter is whether "hand swabs" encompasses "fingernail scrapings." We agree with the trial court's determination that it does. The warrant authorized police to search and retrieve evidence from LaRosa's hands. A reasonable interpretation of that language would include the fingernails, as they are attached to and a part of the hand. There is no danger here, as the Fourth Amendment contemplated, of a seizure of one thing under a warrant describing another, or an exercise of discretion by the officer executing the warrant to search without authorization. We agree with the trial court that an analogy can be drawn from the "description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended" standard used to obtain a search warrant for a premise, and the fingernail scrapings in the matter sub judice.

{¶58} Therefore, it was not error for the trial court to deny the motion to suppress. LaRosa's fourth assignment of error is without merit.

{¶59} LaRosa's fifth assignment of error states:

> **Appellant's Assignment of Error No. 5:** Appellant was denied the effective assistance of counsel when counsel failed to file a motion to suppress evidence seized pursuant to warrant when the warrant was based upon improperly obtained statements from Jacob in violation of Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Ohio Const., art. I, §§1, 10 and 16.

{¶60} On appeal, LaRosa asserts that trial counsel was ineffective because they failed to challenge the search warrant used to obtain the buccal swab, hand swab, and swab of LaRosa's penis. LaRosa claims that the statements he made at the hospital, which the state agreed not to use at trial, were the basis for the warrant.

{¶61} In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that trial counsel's performance fell "below an objective standard of

22

reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus (adopting the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 143. There is a general presumption that trial counsel's conduct is within the broad range of professional assistance. *Id.* at 142. Debatable trial tactics generally do not constitute deficient performance. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995).

**{¶62}** In order to show prejudice, the appellant must demonstrate a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Bradley*, *supra*, at paragraph three of the syllabus.

**{¶63}** LaRosa's challenge to the search warrant is an attack on the affidavit used to secure the warrant, which contained the statements he made at the hospital. LaRosa cannot show he was prejudiced by trial counsel's failure to challenge the search warrant.

**{¶64}** "The Supreme Court of the United States, in *Franks v. Delaware*, set forth a two-part test to be applied in addressing such challenge to affidavits offered in support of a search warrant." *Bangera*, *supra*, at ¶55. "First, the defendant must make a preliminary showing that the affiant included in his affidavit false statements that were made deliberately or with reckless disregard for their truth." *Id.*; *see also State v. Kidd*, 11th Dist. Lake No. 2006-L-193, 2007-Ohio-4113, ¶42.

**{¶65}** "Second, the court must determine if the allegedly false statements were necessary to the issuing judge's finding of probable cause." *Id.*, citing *Franks*, *supra*; *see*

*also State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶17, quoting *United States v. Karo*, 468 U.S. 705, 719 (1984) ("after excising tainted information from a supporting affidavit, 'if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid'") and *State v. Jackson*, 11th Dist. Lake No. 9-130, 1983 WL 6126, *2 ("The *Franks* decision also stands for the proposition that if the questioned material is found to be false and is set aside and there remains sufficient content in the affidavit to support a finding of probable cause, then the search warrant is valid.").

{¶66} Setting aside the statements made at the hospital, there was still overwhelming evidence in the affidavit supporting the judge's finding of probable cause to issue a search warrant. LaRosa had blood on his hands and clothing, as well as his groin. He presented to the hospital with no injuries justifying the blood. A neighbor had video evidence of LaRosa near the victim's property around the suspected time of the crimes. Following the issuance of a valid warrant and consent from the owner of the residence, police recovered clothing, shoes, and glasses belonging to LaRosa which had a substance on them believed to be blood. All of these facts, which were stated in the affidavit submitted for the search warrant, support a finding of probable cause, even without the statements LaRosa made at the hospital.

{¶67} Because LaRosa has not established that the result of the proceedings would have been different had counsel challenged the affidavit, he cannot prevail on his claim of ineffective assistance of counsel. His fifth assignment of error is without merit.

{¶68} LaRosa's seventh assignment of error challenges the voluntary nature of his no contest plea. It states:

**Appellant's Assignment of Error No. 7:** Jacob's plea was not knowingly intelligently and voluntarily entered because the trial court failed to advise Jacob of sex offender registration, requirements at the time of the plea rending [sic] the plea involuntary in violation of the Fifth, Sixth and Fourteenth Amendment to the United States Constitution.

{¶69} "'When a defendant enters a plea in a criminal case, the plea must be made knowingly, intelligently, and voluntarily. Failure on any of those points renders enforcement of the plea unconstitutional under both the United States Constitution and the Ohio Constitution.'" *State v. Gensert*, 11th Dist. Trumbull No. 2015-T-0084, 2016-Ohio-1163, ¶8, quoting *State v. Engle*, 74 Ohio St.3d 525, 527 (1996). "In order for a plea to be knowingly, intelligently, and voluntarily entered, a defendant must be 'informed in a reasonable manner at the time of entering his guilty plea of his rights to a trial by jury and to confront his accusers, and his privilege against self-incrimination, and his right of compulsory process for obtaining witnesses in his behalf.'" *Id.,* quoting *State v. Ballard*, 66 Ohio St.2d 473, 478 (1981), interpreting *Boykin v. Alabama*, 395 U.S. 238, 243 (1969).

{¶70} Criminal Rule 11(C) provides, in relevant part, as follows:

> (2) In felony cases the court may refuse to accept a plea of guilty or a plea of no contest, and shall not accept a plea of guilty or no contest without first addressing the defendant personally and doing all of the following:
>
> > (a) Determining that the defendant is making the plea voluntarily, with understanding of the nature of the charges and of the maximum penalty involved, and, if applicable, that the defendant is not eligible for probation or for the imposition of community control sanctions at the sentencing hearing.
> >
> > (b) Informing the defendant of and determining that the defendant understands the effect of the plea of guilty or no contest, and that the court, upon acceptance of the plea, may proceed with judgment and sentence.

(c) Informing the defendant and determining that the defendant understands that by the plea the defendant is waiving the rights to jury trial, to confront witnesses against him or her, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself.

{¶71} The Ohio Supreme Court has instructed that a trial court must strictly comply with Crim.R. 11(C) as it relates to the waiver of constitutional rights. *State v. Veney*, 120 Ohio St.3d 176, 2008-Ohio-5200, ¶18, citing *State v. Ballard*, 66 Ohio St.2d 473, 479 (1981). Failure to literally comply with the language of Crim.R. 11(C)(2)(c) does not, however, invalidate a plea agreement so long as the record demonstrates that the trial court explained or referred to the constitutional rights "'"in a manner reasonably intelligible to that defendant."'" *State v. Barker*, 129 Ohio St.3d 472, 2011-Ohio-4130, ¶14, quoting *Veney*, *supra*, at ¶27 (emphasis sic), quoting *Ballard*, *supra*, at paragraph two of the syllabus. "[W]ith respect to the nonconstitutional notifications required by Crim.R. 11(C)(2)(a) and 11 (C)(2)(b), substantial compliance is sufficient." *Veney*, *supra*, at ¶14, citing *State v. Stewart*, 51 Ohio St.2d 86 (1977).

{¶72} The Ohio Supreme Court has held "an alleged ambiguity during a Crim.R. 11 oral plea colloquy may be clarified by reference to other portions of the record, including the written plea, in determining whether the defendant was fully informed of the right in question." *State v. Barker*, 129 Ohio St.3d 472, 2011-Ohio-4130, ¶25.

{¶73} Contrary to LaRosa's contention, the record reflects he was advised by the trial court about the sex offender registration requirements prior to pleading no contest. The plea agreement LaRosa signed at the plea hearing specifically stated the

26

requirements for Tier III sex offender status. Further, the court made the following statement before the plea was accepted:

> The Court: Do you understand the serious—and you also have to be classified as a Tier III sex offender. Do you understand the penalties involved for each one of these crimes?
>
> LaRosa: Yes, Your Honor.
>
> The Court: And the seriousness of the offenses?
>
> LaRosa: Yes, Your Honor.
>
> * * *
> The Court: How do you plead to the amended indictment?
>
> LaRosa: No contest.
>
> The Court: I'm showing you this document called Finding on No Contest Plea to Amended Indictment, is that your signature?
>
> LaRosa: Yes, Your Honor.
>
> The Court: Did you sign that freely and voluntarily?
>
> LaRosa: Yes, Your Honor.
>
> The Court: Any promises or threats made to you to sign this document?
>
> LaRosa: No, Your Honor.
>
> The Court: Do you understand what's contained in this document?
>
> LaRosa: Yes, Your Honor.
>
> The Court: And what I've explained to you?
>
> LaRosa: Yes, Your Honor.
>
> The Court: Do you have any questions whatsoever?
>
> LaRosa: No, Your Honor.
>
> The Court: Do you still wish to plead no contest?

LaRosa:  Yes, Your Honor.

{¶74} The Finding on No Contest Plea to Amended Indictment signed by LaRosa states:

> I understand that I am pleading no contest to, and will be found guilty to, a sexually oriented offense in Count 4. I also understand that upon conviction **I will be classified as a Tier III Sex Offender**. I understand that upon conviction (or release from prison, if applicable), I will be required to register, in person, with the sheriff of the county(ies) where I establish residence, employment, and education. I will be required to verify my place of residence, employment and education, in person, with the sheriff every 90 days for life. I understand that as a Tier III Sex Offender, I am subject to community notification. [Emphasis sic.]

{¶75} Any suggestion that LaRosa was unaware that he was required to register as a Tier III sex offender is unsupported by the record.  The trial court duly advised LaRosa of the sex offender registration requirement at the time of his no contest plea, which is also contained in the record in the written plea he signed.

{¶76} LaRosa has not established that his no contest plea was entered involuntarily.  His seventh assignment of error is without merit.

{¶77} LaRosa's third and sixth assignments of error challenge the sentence LaRosa received following the no contest plea and mitigation hearing.

{¶78} LaRosa's third assignment of error states:

> **Appellant's Assignment of Error No. 3:** The trial court erred when it imposed a sentence of life without the possibility of parole based upon factual findings which are inconsistent with the requirements [sic] the Eighth and Fourteenth Amendments to the United States Constitution and Ohio Const., art. I, §9.

{¶79} LaRosa argues his sentence of life in prison without parole violated the prohibition against cruel and unusual punishment pursuant to the Eighth and Fourteenth

28

Amendments to the United States Constitution and Article I, Section 9 of the Ohio Constitution. He relies on the "evolving standards" regarding juvenile offenders following the United States Supreme Court decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), syllabus ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."); *Graham v. Florida*, 560 U.S. 48, 82 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."); and *Miller v. Alabama*, 567 U.S. 460, 489 (2012) ("*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles."). LaRosa also cites Justice Frankfurter's 1950 dissent in *United States v. Rabinowitz*, 339 U.S. 56 (1950), a case which was overruled 50 years ago and dealt with the reasonableness of a search warrant in an adult forgery proceeding. We find *Rabinowitz* wholly inapposite to the present proceeding.

{¶80} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2)(a)-(b).

{¶81} "'A punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community.'" *State v. Dioneff*, 11th Dist. Ashtabula No. 2006-A-0063, 2007-Ohio-3387, ¶79, quoting *State v. Chaffin*, 30 Ohio St.2d 13 (1972), paragraph three of the syllabus. "'Eighth Amendment violations are rare and instances of cruel and unusual punishment are limited to those punishments, which, under the circumstances, would be considered shocking to any reasonable person.'" *Id.*, quoting *State v. Rhodes*, 11th Dist. Lake No. 2000-L-089, 2001-Ohio-8693. "Sentences that fall within the statutory range cannot amount to cruel and unusual punishment." *State v. Lane*, 11th Dist. Geauga No. 2013-G-3144, 2014-Ohio-2010, ¶71 (citations omitted).

{¶82} Here, a sentence of life without parole is within the statutory range for aggravated murder in Ohio. Therefore, the sentence cannot amount to cruel and unusual punishment. Also, it is clear the trial court carefully and thoroughly considered the *Miller* factors for juvenile sentencing in detail, along with all the other evidence and circumstances, before issuing a sentence.

{¶83} The trial court made the following statements in its sentencing entry:

> The Court has considered the record, including all evidence presented at the April sentencing hearing, oral statements, the allocution of the Defendant, the pre-sentence investigation report, and any victim impact statements, the briefs of all parties, as well as the principles and purposes of sentencing under O.R.C. Section 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12.
>
> In imposing this sentence, the Court fully incorporates, by reference, the Judgment Entry memorializing its findings, filed on October 12, 2018. The Court incorporates all findings previously made in that entry with regard to any and all factual and legal issues concerning the sentence imposed [sic] this case.

30

As detailed within the October 12, 2018 Judgment Entry, the Court has considered all relevant factors pursuant to *Miller v. Alabama*, 132 S.Ct. at 2464, 183 L.Ed.2d 407 and *State v. Long*, 138 Ohio St. 3d 478, 8 N.E. 890 (2014).

{¶84} Further, as this court has previously held, the *Roper*, *Graham*, and *Miller* decisions are inapplicable here because "none holds that the sentence of a juvenile homicide offender to a discretionary sentence of life without parole constitutes cruel and unusual punishment." *Lane*, *supra*, at ¶75. "To the contrary, the Supreme Court in *Miller*, *supra*, stated that a sentencing court is *not* precluded from imposing a life-without-parole sentence on a juvenile homicide offender." *Id.* at ¶80 (emphasis sic) (citations omitted).

{¶85} Therefore, the trial court did not impose a sentence inconsistent with the Eighth and Fourteenth Amendments. LaRosa's third assignment of error is without merit.

{¶86} LaRosa's sixth assignment of error states:

**Appellant's Assignment of Error No. 6:** The record clearly and convincingly does not support the trial court's findings in support of consecutive sentences.

{¶87} R.C. 2929.41, which governs multiple sentences, provides, in pertinent part: "Except as provided in * * * division (C) of section 2929.14, * * * a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state[.]" R.C. 2929.41(A). Therefore, a presumption exists in favor of concurrent sentencing absent the applicable statutory exception.

{¶88} Pursuant to R.C. 2929.14(C)(4), a trial court may order separate prison terms for multiple offenses to be served consecutively only if the court finds it "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to

31

the danger the offender poses to the public[.]"  The trial court must also find that one of

the following statutory factors applies:

> (a) The offender committed one or more of the multiples offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶89}  Regarding the imposition of consecutive sentences, the trial court stated the

following during the sentencing hearing:

> Said periods of incarceration on Counts 2, 3, and 4 are to be served consecutively to each other and to Count 1.  The Court finds that because the harm was so great and unusual that a single term does not adequately reflect the seriousness of the defendant's conduct, consecutive terms are necessary to protect the public and to adequately punish the defendant.  Further, the Court finds that consecutive terms are not disproportionate to defendant's conduct and to the public danger posed by this defendant.

The judgment entry entered for sentencing also indicates the same.  Therefore, the trial

court did state appropriate statutory grounds for imposing consecutive prison sentences.

{¶90}  When the trial court properly sets forth the statutory requirements that allow

for imposition of consecutive sentences, our review is limited to whether any of the

findings made by the court are clearly and convincingly not supported by the record.  *State

v. Wilson,* 11th Dist. Lake No. 2017-L-028, 2017-Ohio-7127, ¶20; *State v. Marcum*, 146

32

Ohio St.3d 516, 2016-Ohio-1002, ¶23. In doing so, we keep in mind that the "trial court is not required to give any particular weight or emphasis to a given set of circumstances" when considering the statutory factors. *State v. DelManzo*, 11th Dist. Lake No. 2007-L-218, 2008-Ohio-5856, ¶23.

{¶91} LaRosa's argument on appeal is straightforward: he cannot pose a danger to the public because he has already received a sentence of life without the possibility of parole on Count 1. Therefore, consecutive sentences are not warranted. However, this court and other courts have upheld an imposition of consecutive sentences even where a life without the possibility of parole sentence is imposed on a defendant when the record supports such a finding. *See Lane*, *supra*, at ¶120-132; *State v. Roark*, 3d. Dist. Mercer No. 10-14-11, 2015-Ohio-3811, ¶24. LaRosa has offered no argument that convinces us to abandon precedent on this issue.

{¶92} We do not clearly and convincingly find that the record does not support the trial court's findings under R.C. 2929.14(C). The trial court did not err in ordering consecutive service of LaRosa's sentences.

{¶93} LaRosa's sixth assignment of error is without merit.

{¶94} The judgment of the Trumbull County Court of Common Pleas is affirmed.

CYNTHIA WESTCOTT RICE, J.,

MARY JANE TRAPP, J.,

concur.